EXHIBIT A

PURCHASE AND SALE AGREEMENT

by and among

AZIZ CONVENIENCE STORES, L.L.C.

AND THE UNDERSIGNED LIMITED PARTNERSHIPS

(collectively, as Seller)

and

SUSSER PETROLEUM PROPERTY COMPANY LLC, as Buyer

Dated and Effective as of April 30, 2015

## SCHEDULES

| | |
|---|---|
| Schedule 2.1(a)(i) | Owned Locations |
| Schedule 2.1(a)(ii) | Personal Property and Equipment |
| Schedule 2.1(a)(iv) | Assumed Contracts |
| Schedule 2.1(b) | Excluded Assets |
| Schedule 2.3(c) | Inventory Method |
| Schedule 2.4 | Valuation Schedule |
| Schedule 2.5(a) | Due Diligence Deliverables |
| Schedule 3.9 | Permits; Compliance |
| Schedule 3.10(a) | Seller Operated USTs |
| Schedule 3.10(d) | Environmental (LPST) Claims/Locations |
| Schedule 3.11 | Insurance Policies |
| Schedule 5.7 | Allocation Schedule |
| Schedule 5.14(a) | Bid Procedures |
| | |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Seller's Certification |
| Exhibit B | Special Warranty Deed-Owned Locations |
| Exhibit C | Bill of Sale, Assignment and Assumption |

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this *Agreement*"), effective as of April 30, 2015 (the "*Effective Date*"), is made and entered into by and among AZIZ Convenience Stores L.L.C., a Texas limited liability company ("*ACS*"), the undersigned limited partnerships affiliated with ACS (each an "*Aziz Partnership*" and together with ACS, collectively, "*Seller*") and Susser Petroleum Property Company LLC, a Delaware limited liability company ("*Buyer*").

## RECITALS

Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Assets (as defined below), all on the terms and subject to the conditions set forth herein.

## STATEMENT OF AGREEMENT

In consideration of the Purchase Price, the promises and mutual representations, warranties, covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Buyer and Seller agree as follows:

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION

*1.1    Definitions.* As used in this Agreement, the following capitalized terms have the meanings set forth below:

"*Affiliate*" means any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities or ownership interests, by contract or otherwise, and specifically with respect to a corporation, partnership or limited liability company, means direct or indirect ownership of 50% or more of the voting securities in such corporation or of the voting interest in a partnership or limited liability company.

"*Agreement*" has the meaning given to it in the introduction to this Agreement.

"*Assets*" has the meaning given to it in Section 2.1(a).

"*Assumed Liabilities*" has the meaning given to it in Section 2.2.

"*Bankruptcy Case*" means Case No. 14-70427, in re. Aziz Convenience Stores, L.L.C., pending in the Bankruptcy Court.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, McAllen Division.

1

"***Business***" means the business of Seller as conducted at the Owned Locations.

"***Business Day***" means a day other than Saturday, Sunday or holidays recognized by the Federal Reserve Bank of Dallas.

"***Buyer***" has the meaning given to it in the introduction to this Agreement.

"***Buyer's Closing Deliverables***" has the meaning given to it in Section 2.7(b).

"***Charter Documents***" means with respect to any Person, the articles or certificate of formation or incorporation and by-laws, the partnership agreement, the limited liability company agreement, the trust agreement, or such other organizational documents of such Person, and which establish the legal personality of such Person.

"***Claim***" means any demand, claim, action, investigation, legal proceeding (whether at law or in equity) or arbitration.

"***Closing***" means the consummation of the sale and purchase of the Assets contemplated by this Agreement, as provided for in Section 2.6 and Section 2.7.

"***Closing Date***" means the date on which the Closing occurs, as provided for in Section 2.6.

"***Closing Conditions***" means the conditions to Closing set forth in Articles 6 and 7 hereof.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Contract***" means any written or oral contract, agreement, lease, license, evidence of indebtedness, mortgage, indenture, purchase order, binding bid, letter of credit, security agreement or other legally binding arrangement.

"***Due Diligence Deliverables***" has the meaning given to it in Section 2.5(a).

"***Due Diligence Period***" has the meaning given to it in Section 2.5(b).

"***Earnest Money***" has the meaning given to it in Section 2.3(a).

"***Effective Date***" has the meaning given to it in the introduction to this Agreement.

"***Employees***" has the meaning given to it in Section 5.9.

"***Environmental Law***" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq.; the Safe Drinking

Water Act, 42 U.S.C. §§ 300f through 300j; the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., the Energy Policy Act of 2005, PL 109-58, and the Superfund Amendments and Reauthorization Act of 1986, 42 USC § 9601 et seq., the regulations promulgated pursuant thereto, any regulations or requirements of (i) TCEQ (defined below), including those in Title 30 of the Texas Administrative Code, (ii) The Edwards Aquifer Authority and (iii) all similar Laws (including implementing regulations) of any Governmental Authority having jurisdiction over the Assets and addressing pollution or protection of the environment or natural resources, each as amended on or prior to the Closing Date.

*"Fuel Inventory"* has the meaning given to it in Section 2.1(a)(ii).

"*Governmental Approvals*" has the meaning given to it in Section 5.3.

"*Governmental Authority*" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States or any state, county, city or other political subdivision or similar governing entity.

*"Hazardous Material"* means each substance designated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant or toxic substance under any Environmental Law including, but not limited to petroleum products and byproducts or constituents thereof or polychlorinated biphenyls.

"*Inventory*" means Fuel Inventory, Supplies Inventory and Merchandise Inventory.

"*Laws*" means all laws, statutes, rules, regulations, ordinances, writs, injunctions, decrees, judgments and any pronouncements having the effect of law of any Governmental Authority.

"*Liabilities*" means, with respect to any Person, any liability (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), obligation, fine, penalty, investigation, action, proceeding, claim, judgment, settlement, cost, damage (including natural resource damages) expense, capital expenditure (including, without limitation, reasonable fees, disbursements and expenses of legal counsel, experts, engineers and consultants, and the costs of investigation or feasibility studies and performance of remedial action), including without limitation any liability for Taxes and **STRICT LIABILITY** arising under Environmental Laws or otherwise.

"*Lien*" and "*Liens*" have the meaning given to them in Section 2.1(a).

"*Loss*" or "*Losses*" means any and all judgments, losses, liabilities, demands, amounts paid in settlement, damages, fines, judgments, suits, costs, penalties, deficiencies, losses and expenses (including interest, court costs, reasonable fees of attorneys, accountants and other experts or other reasonable expenses of litigation or other proceedings or of any claim, default or assessment).

"*Material Adverse Effect*" means a material adverse effect on (a) the Business, Assets, properties, results of operations or financial condition of the Business, taken as a whole or (b) the

3

ability of Seller (or any of them) to consummate the transactions contemplated by this Agreement.

*"Merchandise Inventory"* has the meaning given to it in Section 2.1(a)(ii).

*"Owned Locations"* has the meaning given to it in Section 2.1(a)(i).

*"Party"* means Buyer on the one hand, and Seller, on the other hand, as the context requires and *"Parties"* means Buyer and Seller collectively.

*"Permits"* means any permit, license, sublicense, certificate, approval, consent, notice, waiver, variance, franchise, registration, order, filing, accreditation, or other similar authorization required by any Law or Governmental Authority or granted by any Governmental Authority.

*"Permitted Exceptions"* has the meaning given to it in Section 5.5(a).

*"Permitted Lien"* means (a) any Lien for Taxes, assessments and any other governmental charges, which are not yet due but which will be paid by Seller when they become due, (b) any Lien arising in the ordinary course of business by operation of Law with respect to Liabilities that are not yet due or delinquent, (c) all Permitted Exceptions, (d) zoning, building and other similar laws applicable to the ownership, use or development of the Assets, and (e) the terms and conditions of the Assumed Contracts.

*"Personal Property and Equipment"* has the meaning given to it in Section 2.1(a)(ii).

*"Person"* means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, joint venture, unincorporated organization, other business organization, trust, union, association or Governmental Authority.

*"Purchase Price"* has the meaning given to it in Section 2.3.

*"Release"* means any release, spill, emission, migration, leaking, pumping, injection, deposit, disposal or discharge of any Hazardous Materials into the environment.

*"Representatives"* means, as to any Person, the partners, officers, directors, employees, agents, legal counsel, accountants, financial advisers and consultants of such Person and its Affiliates.

*"Retained Liabilities"* has the meaning given to it in Section 2.2.

*"Schedules"* means the schedules attached to, and made a part of, this Agreement.

*"Seller"* has the meaning given to it in the introduction to this Agreement.

*"Seller Closing Deliverables"* has the meaning given to it in Section 2.7(a).

*"Supplies Inventory"* has the meaning given to it in Section 2.1(a)(ii).

*"Survey"* and *"Surveys"* have the meaning given to them in Section 5.5(b).

"*Taxes*" means (i) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all income, gross receipts, capital, sales, use, fuel, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real property, personal property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing authority in connection with any item described in clause (i), and (iii) any liability in respect of any items described in clauses (i) or (ii) payable by reason of Contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof of any analogous or similar provision under Law) or otherwise.

"*Tax Return*" means any return, report or statement required to be filed with respect to any Tax (including any elections, declarations, schedules or attachments thereto, and any amendment thereof) including any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes any Seller or any of their Affiliates.

"*TCEQ*" means the Texas Commission on Environmental Quality.

"*Termination Fee*" has the meaning given to it in Section 8.1(c).

"*Title Commitments*" has the meaning given to it in Section 5.5(a).

"*Title Company*" means San Jacinto Title Service of Texas, 520 Lawrence Street, Corpus Christi, Texas 78401 Attn: Shelly Cristan-Grahmann, or any other title company chosen by Buyer by written notice to Seller.

"*Title Objections*" has the meaning given to it in Section 5.5(a).

"*Title Policies*" has the meaning given to it in Section 5.5(c).

### 1.2   Rules of Construction.

(a)   All article, section, subsection, schedule and exhibit references used in this Agreement are to articles, sections, subsections, schedules and exhibits to this Agreement unless otherwise specified. The exhibits and schedules attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes. The provision of a table of contents, the division of this Agreement into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

(b)   If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Unless the context of this Agreement clearly requires otherwise words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "*includes*" or "*including*" shall mean "*including without limitation*," the words "*hereof*," "*hereby*," "*herein*," "*hereunder*" and similar terms in this Agreement shall refer to this Agreement as a whole and not any

5

particular section or article in which such words appear. Currency amounts referenced herein are in U.S. Dollars.

(c)     Time is of the essence in this Agreement. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(d)     All accounting terms used herein and not expressly defined herein shall have the meanings given to them under U.S. generally accepted accounting principles.

(e)     The Parties acknowledge that they and their attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party or any similar rule operating against the drafter of an agreement shall not be applicable to the construction or interpretation of this Agreement.

## ARTICLE II

## SALE AND PURCHASE

### 2.1    Assets; Excluded Assets.

(a)     *Assets*. On the terms and subject to the conditions contained in this Agreement, Seller shall sell, transfer, convey, assign and deliver to Buyer at the Closing on the Closing Date, and Buyer shall buy from Seller, free and clear of all liens, hypothecations, easements, covenants, title defects, restrictions, encumbrances, mortgages, pledges, charges, options, rights, security interests, rights of first refusal, leases, options, conflicting claims of ownership, agreements or Claims of any nature whatsoever, recorded or unrecorded (individually a "*Lien*" and collectively the "*Liens*"), except for Permitted Liens, all of Seller's right, title and interest in and to the following (collectively, the "*Assets*"):

(i)     the real property owned in fee simple by Seller identified on Schedule 2.1(a)(i), together with all fixtures and improvements thereon, and all of Seller's estates, rights, titles and interests in and to all tenements, hereditaments, easements, rights-of-way, rights, rights of ingress and egress, reversionary interests, all oil, gas and other minerals, and privileges and appurtenances belonging, pertaining or relating thereto (the "*Owned Locations*"), it being acknowledged by the parties that the Owned Locations are intended to include all lots on which a currently operating store is located, plus any lots contiguous thereto that are owned by any Seller (or another Aziz related limited partnership), and Schedule 2.1(a)(i) will be updated as necessary by the parties prior to Closing to reflect all such lots;

(ii)     all supplies inventory (the "*Supplies Inventory*"), merchandise inventory (the "*Merchandise Inventory*"), fuel inventory (the "*Fuel Inventory*"), motor fuel equipment (including signage, canopies, POS systems, dispensers, underground storage tanks and all related lines, pumps, meters and ATGs), and other equipment, personal property or assets owned by Seller at the Owned Locations, as more particularly listed on Schedule 2.1(a)(ii) (the "*Personal Property and Equipment*");

6

(iii) all permits and licenses held by Seller and used in the operation of the Owned Locations (the "**Transferred Permits**");

(iv) the specific leases and contracts listed on Schedule 2.1(a)(iv) (the "**Assumed Contracts**").

(b) **Excluded Assets.** Notwithstanding anything to the contrary contained in this Section 2.1 or elsewhere in this Agreement, the following assets of Seller (collectively, the "**Excluded Assets**") are not part of the sale and purchase contemplated hereunder, are excluded from the Assets being purchased, and shall remain the property of Seller after the Closing:

(i) the 200 acre tract of undeveloped land owned by ACS;

(ii) equipment located at or in the Owned Locations that is not the property of Seller (i.e. ATM machines, etc.);

(iii) all cash, cash equivalents and short-term investments of Seller;

(iv) all accounts receivable of Seller;

(v) all minute books, stock records, personnel records, and company records;

(vi) all causes of action under Sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code;

(vii) all claims and causes of action against insiders, known or unknown, whether by statute, by contract, at law or under principles of equity;

(viii) all rights and obligations of Seller under this Agreement, the Bill of Sale, and any other documents or agreements executed by the parties in connection with this Agreement; and

(ix) any other Excluded Assets listed on Schedule 2.1(b).

**2.2** **Liabilities.** At the Closing, Buyer shall assume and agree to discharge only the obligations expressly assumed elsewhere under this agreement and following obligations (the "**Assumed Liabilities**"):

(a) subject to proration, all ad valorem taxes for the year 2015 and all subsequent years for the Owned Locations and all other obligations relating to the ownership and operation of the Owned Locations arising from and after the Closing Date, including subsequent assessments for 2015 and prior years due to change in land usage, ownership, or both; and

(b) all obligations of Seller under the Assumed Contracts for periods on and after the Closing Date.

All contracts and Liabilities not expressly assumed by Buyer in this Agreement (the "**Retained Liabilities**") shall remain the sole responsibility of and shall be retained by Seller.

7

**2.3** **_Purchase Price._** In consideration for the sale and assignment by Seller to Buyer of the Assets and assumption by Buyer of the Assumed Liabilities as expressly contemplated in Section 2.2, Buyer shall pay the following consideration to Seller (collectively, the "***Purchase Price***"):

(a) Within three Business Days of the date that the last of Buyer or Seller executes this Agreement, Buyer shall deposit with the Title Company by wire transfer the sum of One Million and No/100 Dollars ($1,000,000.00) (the "***Earnest Money***"). The Title Company shall hold such sum in escrow as agent for Seller and Buyer pursuant to the terms contained herein. The Earnest Money shall be invested as Buyer may direct in a money center bank that is a member of the FDIC. All interest on the Earnest Money shall accrue to the benefit of Buyer unless otherwise expressly provided for herein and, the Earnest Money (including all interest thereon) shall be a portion of the Purchase Price and paid to Seller at Closing. If this Agreement is terminated by Buyer on or before expiration of the Due Diligence Period based on the provisions set forth below in Section 2.5, or the contemplated Closing on the sale and purchase of the Assets does not close due to no fault of or breach by Buyer, the Earnest Money (or portion thereof, as applicable), including accrued interest, shall be refunded to Buyer, otherwise the Earnest Money will be applied to the Purchase Price at Closing.

(b) At the Closing, Buyer shall deliver to Seller, in immediately available funds, Twenty Eight Million and No/100 Dollars ($28,000,000.00), exclusive of adjustments, closing costs and prorations; provided that the Earnest Money shall be credited to this portion of the Purchase Price at Closing.

(c) Within three (3) days after the Closing Date, Seller and Buyer shall, sharing the costs equally, perform and complete a physical inventory, using an independent third party provider mutually agreed upon by Seller and Buyer, to determine the value of the Fuel Inventory, Supplies Inventory and Merchandise Inventory. Such inventory shall be taken as of the Closing Date or another mutually acceptable date under the joint direction of Seller and Buyer performed in accordance with the fuel inventory method, supplies inventory method, and merchandise inventory method (collectively the "***Inventory Method***") described in Schedule 2.3(c). Within ten (10) days after completion of the inventory, Buyer shall pay an additional amount (the "***Inventory Payment***") to Seller equal to the sum of (i) sixty percent (60%) of the retail value of the Merchandise Inventory, (ii) the delivered cost of all Fuel Inventory, plus any Taxes already paid on such Fuel Inventory by Seller, (iii) the delivered cost of all Supplies Inventory, plus any Taxes already paid on such Supplies Inventory by Seller, and (iv) any amounts received by Buyer arising from or as a result of motor fuel sales that take place prior to the completion of the physical inventory. All motor fuel sales and merchandise sales before the completion of the physical inventory shall be for the account of Seller, and Buyer will promptly pay over to Seller (as part of the Inventory Payment) any funds received by Buyer from sales of motor fuel and merchandise before the completion of the physical inventory. All motor fuel sales and merchandise sales after the completion of the physical inventory shall be for the account of Buyer.

**2.4** **_Casualty and Condemnation._** If any of the Owned Locations (building or fixture located thereon) has been materially damaged or destroyed or taken by condemnation before the Closing Date, and said damage, destruction or condemnation materially interferes with the ability

8

to operate said Owned Location, and either party notifies the other of such damage or destruction, then Buyer may, prior to the Closing Date, exclude such Owned Location from the Assets by providing written notice to Seller, in which event (i) the Purchase Price shall be adjusted by the value allocated to such Owned Location in Schedule 2.4; and (ii) Buyer shall have no further rights or obligations with respect to such excluded Owned Location. If Buyer does not elect to exclude such Owned Location from the Assets, then (a) Buyer shall be entitled to any insurance proceeds or condemnation awards on account of such event, (b) the Closing shall take place as provided herein, and (c) there shall be assigned to Buyer at the Closing Date all interests of Seller in and to any insurance proceeds or condemnation awards payable on account of such event.

## 2.5    *Due Diligence Period and Deliverables.*

(a)    Seller shall deliver, to Buyer, as quickly as possible and, in any event, within fifteen (15) days from the Effective Date (except for the Title Commitments which shall be delivered pursuant to Section 5.5(a)), all materials responsive to the due diligence items listed on Schedule 2.5(a) that exist and are in the possession of Seller or are easily obtainable by Seller (the "*Due Diligence Deliverables*").

(b)    For a period of seventy five (75) days, after the Effective Date (the "*Due Diligence Period*"), Buyer and its Representatives shall have the right to conduct certain due diligence inspections of the Assets as described below. In the event Buyer does not terminate the Agreement within the Due Diligence Period as provided in this Section 2.5(b), this Agreement shall continue in full force and effect.

(i)    For a period of thirty (30) days following the Effective Date (the "*Termination Period*"), Buyer shall have the right to terminate the Agreement based upon Buyer's environmental compliance testing and tank bottom testing results as well as its review of environmental records and physical inspection of the Owned Locations, and its review of environmental records, accounting records, POS equipment, back office equipment and records and store inspections. Should Buyer elect to terminate pursuant to this Section 2.5(b)(i), the Earnest Money less $10,000.00 shall be immediately refunded to Buyer by the Title Company, and such $10,000 shall be paid to Seller as independent consideration for Buyer's right to terminate hereunder.

(ii)    For a period of forty five (45) days following the Effective Date Buyer shall have the right to review of the Surveys and Title Commitments for the Owned Locations, and if there are one or more material and reasonable objections or issues with the Survey or Title Commitment as to any particular Owned Location, and such objections or issues are not timely addressed by Seller (or agreed by Seller to be addressed and handled by Seller, whether before or after Closing), then Buyer may exclude such Owned Location from the Assets by providing written notice to Seller within such forty-five (45) day period, in which event (i) the Purchase Price shall be adjusted by the value allocated to such Owned Location in Schedule 2.4; and (ii) Buyer shall have no further rights or obligations with respect to such excluded Owned Location.

(iii)    For a period of seventy-five (75) days following the Effective Date, in the event that (1) the Phase II environmental testing for any Owned Location shows results that are above

TCEQ actionable levels, and (2) the cost of environmental remediation required to address such findings would materially affect the value of an Owned Location, then Buyer may exclude such Owned Location from the Assets by providing written notice to Seller within such seventy-five (75) day period, in which event (x) the Purchase Price shall be adjusted by the value allocated to such Owned Location in Schedule 2.4; and (y) Buyer shall have no further rights or obligations with respect to such excluded Owned Location.

(iv) If Buyer does not timely terminate this Agreement under Section 2.5(b)(i), or exclude any Owned Locations under Section 2.5(b)(ii) or (iii) within the time periods therein stated, then Buyer shall thereafter have no further rights to terminate this Agreement based on due diligence results and may not thereafter terminate this Agreement or exclude any further Owned Locations except as otherwise provided in Article VIII below.

(c) All such inspections, investigations and examinations shall be undertaken at Buyer's sole cost and expense; and Buyer (i) shall reasonably restore the Owned Locations to their condition prior to said access and investigations, reasonable wear and tear excepted; (ii) shall indemnify and hold Seller harmless from all liability, actions, causes of action, suits, loss, cost, expenses or damage, including reasonable attorneys' fees, arising from said access and investigations to the extent attributable or alleged to be attributable to the conduct, acts or omissions of Buyer, its agents or contractors; (iii) shall keep confidential and not disclose the results of any such investigation to any third party, other than Buyer's Representatives, without Seller's express written permission and (iv) shall undertake any such inspections and investigations so as not to interfere or disrupt unreasonably any of Seller's business operations. Buyer shall give Seller notice prior to conducting any invasive testing or subsurface testing and Seller may accompany and observe performance of any such testing. The provisions of clauses (i)-(iii) above shall survive any termination of this Agreement and the provisions of clause (ii) above shall survive the Closing. Upon a termination of this Agreement, Buyer shall return all Due Diligence Deliverables provided by Seller or any of their contractors, agents or consultants to Seller. Buyer shall, within three (3) business days after receipt by Buyer, provide to Seller copies of all final versions of all surveys, environmental reports and other due diligence reports of any kind obtained by Buyer from any third parties, and Buyer acknowledges that all such reports may be posted by Seller in its data room for review by other potential bidders on the Assets.

**2.6** **_Closing._** The Closing of the transactions contemplated herein shall take place at the offices of the Title Company (or another mutually agreeable location), no later than ten (10) days after the entry of the Sale Order (as defined below). The date on which the Closing takes place is referred to herein as the "**_Closing Date_**".

**2.7** **_Instruments of Transfer; Further Assurances._**

(a) At the Closing, Seller shall execute and deliver to Buyer [or any designated assignee] (i) Special Warranty Deeds in the form attached hereto as Exhibit B covering the Owned Locations, (ii) Bill of Sale, Assignment and Assumption ("**_Bill of Sale_**") in the form attached hereto as Exhibit C for the Inventory, Personal Property and Equipment, Permits, and Assumed Contracts, (iii) a certificate in the form attached hereto as Exhibit A, signed by the Chief Executive Officer and Chief Financial Officer of Seller, in form and

10

substance reasonably satisfactory to Buyer, dated the Closing Date, to the effect that each of the conditions specified in Article 6 below have been satisfied, (iv) a certificate from the Seller of non-foreign status in form and substance reasonable acceptable to Buyer, (v) the Title Policies, (vi) such documents as may be reasonably required by Buyer or the Title Company evidencing the status and capacity of Seller and the authority of the persons who are executing the Closing Deliverables, and (vii) such other documents or instruments of transfer as shall be reasonably necessary for the consummation of the transactions contemplated by this Agreement or appropriate to vest in Buyer good and marketable title to the Assets, or otherwise give full and appropriate effect to the purposes and intent of this Agreement (the items described in the foregoing Sections 2.7(a)(i)-(vii) (being collectively herein referred to as the "*Seller Closing Deliverables*").

(b)     At Closing, Buyer shall deliver the Purchase Price to Seller in cash or other immediately available funds, and shall execute and deliver to Seller at Closing (i) the counterparts of the Bill of Sale described in subsection (a) above, (ii) such documents as may be reasonably required by Seller or the Title Company evidencing the status and capacity of Buyer and the authority of the persons who are executing the Buyer's Closing Deliverables, and (iii) such other documents or instruments of transfer as shall be reasonably necessary for the consummation of the transactions contemplated by this Agreement (the items described in this Section 2.7(b) (being collectively herein referred to as the "*Buyer Closing Deliverables*").

(c)     Within fifteen (15) days after the Closing Date, Buyer shall deliver to Seller the Inventory Payment in cash or other immediately available funds.

(d)     Other than as specified elsewhere herein, each Party shall be solely responsible for and bear all costs and expenses (including any broker's fees, finder's fees, attorney's fees and fees of other representatives) incurred by said Party in connection with evaluating, negotiating, pursuing or consummating the transaction contemplated by this Agreement.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer that:

*3.1     Organization.*   Each Seller is duly formed and validly existing under the Laws of the state where organized and is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the Assets are physically located or such Seller conducts business operations.

*3.2     Authority & Enforceability.*   Seller has all requisite power and authority to execute and deliver this Agreement and the documents contemplated hereby to be executed by it, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and the documents contemplated hereby to be executed by Seller, and the consummation by Seller of the transactions contemplated hereby and thereby, have been duly and validly authorized by all

11

necessary action on the part of Seller. This Agreement and the documents contemplated hereby to be executed by the Seller have been duly and validly executed and delivered by Seller.

**3.3     No Conflicts.** The execution and delivery by Seller of this Agreement and the documents contemplated hereby to be executed by Seller do not, and the performance by Seller of its obligations hereunder and thereunder will not directly or indirectly (a) conflict with or result in a violation or breach of any of the terms, conditions or provisions of the Charter Documents of Seller, (b) result in the imposition or creation of any Lien upon or with respect to any of the Owned Locations or Personal Property and Equipment, (c) result in any member or equityholder having the right to exercise dissenters' appraisal rights or any Person having a right of first refusal or other preferential right with respect to the Assets, or (d) conflict with, violate or breach any material term or provision of any Law applicable to Seller or any material Assets.

**3.4     Legal Proceedings.** Seller has not been served with notice of any Claim related to the Assets, and to the actual knowledge of Seller, none is threatened against Seller relating to the Assets.

**3.5     Sufficiency of Assets.** The Assets constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate the Business in the manner presently operated and include all of the assets utilized in the operations.

**3.6     Taxes.** Seller is not a "foreign person" within the meaning of Section 1445 of the Code. All tax returns that are required to be filed on or before the Closing Date by Seller with respect to the Assets and business operations have been or will be duly and timely filed and are or will be true and complete.

**3.7     Ownership & Capitalization.** Seller owns the Assets in the manner reflected on Schedules 2.1(a)(i)-(iii).

**3.8     Real Property.**

(a)     Seller holds indefeasible fee title to the Owned Locations, free and clear of any encumbrances, including but not limited to all Liens (other than Liens that will be extinguished at Closing), except for the Permitted Liens. Schedule 2.1(a)(i) contains street addresses and tax parcel identification numbers for all of the Owned Locations. To Seller's actual knowledge, none of the improvements situated on the Owned Locations constitute a violation of applicable Laws. None of the Owned Locations are subject to any rights of first refusal or options to purchase.

(b)     To the actual knowledge of Seller, there does not exist any threatened or contemplated condemnation or eminent domain proceedings that would render it economically unfeasible to use the Owned Locations as Seller currently uses such Owned Locations, and Seller has not received any notice, oral or written, of the intention of any Governmental Authority or other Person to take or use all or any part thereof.

**3.9     Permits.** Schedule 3.9 lists all Permits by Owned Location which are held by Seller in connection with Seller's operation of the Business. As of the date of this Agreement, to

12

the actual knowledge of Seller, Seller has not received any written notification from any Governmental Authority alleging that Seller is in violation of any of such Permits.

### *3.10 Environmental Matters.*

(a)     Schedule 3.10(a) lists:

(i)     all of the storage tanks (whether underground or aboveground) owned, used or controlled by the Seller or located on the Owned Locations including the size of each tank and the date of installation of each tank; and

(ii)     any and all known Releases of Hazardous Materials on the Owned Locations.

(b)     To the actual knowledge of Seller, Seller has not received written notice of any Claim by a property owner or other person adjacent to any of the Owned Locations related to a Release originating from any of the Owned Locations.

(c)     To the actual knowledge of Seller, all of the underground and aboveground storage tanks currently located on the Owned Locations are registered in the name of Seller and are registered pursuant to the requirements of Section 334.7 of the Texas Administrative Code.

(d)     Except as set forth on Schedule 3.10(d), to the actual knowledge of Seller, Seller has not been served with notice of any Claims pursuant to any Environmental Laws, which Claims are currently outstanding, and no such Claims are threatened by any Governmental Authority or third-party.

*3.11 Insurance.* Schedule 3.11 sets forth (a) a list of all environmental liability insurance policies covering the Assets and the Business, and (b) a list of all policies of insurance applicable to the Assets or operations of the Business. On or before the Closing Date Seller shall deliver a summary of the loss experience, if any, under each policy occurring from January 1, 2012, through Closing. All premiums due and payable under such policies have been paid, and Seller is otherwise in material compliance with the terms and conditions of all such policies. There is no threatened termination of such policies. Seller shall maintain such policies through the Closing.

**EXCEPT AS SPECIFICALLY SET FORTH IN THIS ARTICLE 3, SELLER DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES, ORAL OR WRITTEN, EXPRESS OR IMPLIED, REGARDING THE ASSETS OR ANY OTHER MATTERS, AND ALL OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY DISCLAIMED INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IT BEING UNDERSTOOD THAT EXCEPT AS OTHERWISE PRIVIDED IN THIS AGREMEENT, BUYER IS ACCEPTING THE ASSETS "AS IS," "WHERE IS," AND "WITH ALL FAULTS."**

13

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that:

**4.1**    ***Organization.*** Buyer is duly formed, validly existing and in good standing under the Laws of the state where organized.

**4.2**    ***Authority.*** Buyer has all requisite power and authority to execute and deliver this Agreement and the documents contemplated hereby to be executed by Buyer, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and the documents contemplated hereby to be executed by Buyer, and the performance by Buyer of its obligations hereby and thereby have been duly and validly authorized by all necessary action on behalf of Buyer. This Agreement and the documents contemplated hereby to be executed by Buyer have been duly and validly executed and delivered by Buyer.

**4.3**    ***No Conflicts.*** The execution and delivery by Buyer of this Agreement and the documents contemplated hereby to be executed by Buyer do not, and the performance by Buyer of its obligations hereunder and thereunder will not (a) conflict with or result in a violation or breach of any of the terms, conditions or provisions of its Charter Documents, (b) violate, or result in a default (or give rise to any right of termination, cancellation or acceleration) under, any material Contract to which Buyer is a party, except for any such violations or defaults (or rights of termination, cancellation or acceleration) which would not, in the aggregate, reasonably be expected to result in a material adverse effect on Buyer's ability to perform its obligations hereunder, or (c) conflict with, violate or breach any material term or provision of any Law applicable to Buyer or any of its material assets or require any material consent or approval of any Governmental Authority under any applicable Law.

**4.4**    ***Legal Proceedings.*** Buyer has not been served with notice of any Claim, and to Buyer's actual knowledge, none is threatened, against Buyer which seeks a judgment or order restraining, enjoining or otherwise prohibiting or making illegal any of the transactions contemplated by this Agreement.

**4.5**    ***Brokers.*** Buyer does not have any liability or obligation to pay fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Seller could become liable or obligated.

## ARTICLE V

### COVENANTS

The Parties hereby covenant and agree as follows:

**5.1**    ***Conduct of Business.*** Except as otherwise contemplated by this Agreement or any document contemplated by this Agreement, Seller shall use commercially reasonable efforts

14

to (i) operate the Business in accordance with the manner as it is being operated as of the Effective Date, (ii) maintain insurance upon all of the Assets and of the Business in such amounts and of such kinds comparable to that in effect on the Effective Date, and (iii) comply in all material respects with all applicable Laws. Between the Effective Date and the Closing Date, without the prior written consent of Buyer, Seller shall not:

(a)     take any affirmative action that would reasonably be expected to result in a Material Adverse Effect;

(b)     sell (other than sales of inventory in the ordinary course of Business), lease, remove or otherwise dispose of any Asset or create any Lien or encumbrance (other than Permitted Liens) on any Asset;

(c)     enter into, extend, amend in any material manner, terminate or voluntarily consent to the termination of any lease or any service, maintenance or management contract; or

(d)     sell nor allow any equity-holder of Seller to sell, transfer, or convey any of their respective ownership interests, grant any rights or options to purchase any of such ownership interests, or permit or suffer to exist any lien or encumbrance on any of such ownership interests.

**5.2     *Records and Reports.*** Seller shall maintain the books, accounts and records in the usual, regular and ordinary course of business through the Closing Date.

**5.3     *Regulatory Matters.*** Seller and Buyer shall use commercially reasonable efforts to obtain all Permits, actions, non actions, waivers, consents, approvals, orders and authorizations from Governmental Authorities at the earliest possible date ("***Governmental Approvals***"), to make all registrations, declarations and filings with Governmental Authorities required to consummate the transactions contemplated in this Agreement, and to assist and cooperate with the other Parties with respect to such efforts.

**5.4     *Prorated Items.*** Seller shall be responsible and liable for and agree to timely pay for all charges for water, gas, electricity, telephone service, assessments, real property Taxes, utilities and like expenses for the period prior to the Closing for the Owned Locations, even though the same may be billed, assessed or received after the Closing Date. Buyer shall be responsible and liable for and agrees to timely pay for all charges for water, gas, electricity, telephone services, assessments, real property Taxes, utilities and like expenses for the period beginning after the Closing for the Owned Locations. Buyer and Seller shall cooperate following Closing as needed to determine the applicable prorations and agree to promptly pay the other party such amounts as are necessary to effect the applicable prorations.

**5.5     *Title and Survey.***

(a)     Seller shall deliver to Buyer, within twenty-one (21) days after the Effective Date, current commitments for the issuance of Owner's Policies of Title Insurance for each of the Owned Locations (the "***Title Commitments***") prepared by the Title Company setting forth the state of title to the Owned Locations, as represented by the Title Company, together

15

with the Title Company's legal description for each of the Owned Locations and legible copies of all recorded exceptions or conditions to such title, along with a current tax certificate. Buyer shall have a period of forty (40) days from the Effective Date in which to review the Title Commitments and Surveys and to deliver to Seller in writing such objections as Buyer may have to anything contained or set forth in the Title Commitments or Surveys ("*Title Objections*"). Within five (5) days from the receipt of Title Objections, Seller shall have the right, but not the obligation, to cure such Title Objections, or to commit to cure such Title Objections. In the event Seller cannot or refuses to cure any such Title Objection for an Owned Location (or commit to cure) within the forty-five (45) day period, Buyer may exclude that Owned Location in accordance with Section 2.5(b)(ii) above. In the event Buyer does not object to any title exception or condition or in the event Buyer waives any Title Objections in writing then such exceptions shall be deemed "*Permitted Exceptions*". Buyer has no obligation to object to the items contained within Schedule C of the Title Commitments and matters contained therein will not be Permitted Exceptions. Seller shall satisfy all requirements listed on Schedule C of the Title Commitments.

(b)     Within forty (40) days after the Effective Date, Buyer shall cause a current metes and bounds survey of the Owned Locations, and any improvements located thereon, dated subsequent to the Effective Date and prepared by a registered professional engineer in accordance with the Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys (individually a "*Survey*" and collectively, the "*Surveys*"). Buyer shall furnish a copy of the Surveys to the Title Company. Without limiting the foregoing, the Surveys shall (i) show the location of all above improvements on the Owned Locations (including, without limitation, buildings, signs, sidewalks, fences, parking areas, parking spaces and visible utility lines) and the exterior horizontal dimensions of all buildings; (ii) show all building setback lines, if any, easements and rights-of-way over or abutting the Owned Locations, both recorded (identified by recording data) and visible evidence of any that may be unrecorded; (iii) show the location of all public streets abutting the Owned Locations and any non-abutting streets which provide apparent means of access to the Owned Locations and fixtures and improvements; (iv) reflect any encroachments of improvements on the Owned Locations on or over adjacent property and any encroachments of improvements on adjacent property on or over the Owned Locations; (v) reflect the location of any other matters capable of being shown on a survey and which are shown as exceptions in the Title Commitments, as hereinafter defined; (vi) contain an appropriate metes and bounds or platted legal description of the Owned Locations; and (vii) show the number of gross square feet contained in each of the Owned Locations. The Surveys shall state whether or not the Owned Locations are located in a flood prone area or the 100-year flood plain as established by the U.S. Army Corps of Engineers or the National Flood Insurance Administration.

(c)     At the Closing, Seller, at Seller's expense, shall furnish Buyer (and/or any designated assignees) Owners Policies of Title Insurance (the "*Title Policies*") for the Owned Locations in the amount shown on Schedule 2.4, issued by the Title Company on the standard form in use in the State of Texas, insuring good and indefeasible Title to the Owned Locations in the Buyer (or its designated assignees), subject only to the Permitted Exceptions and the standard printed exceptions, except (i) the exception relating to restrictions against the Owned Locations shall be endorsed by the Title Company to read "none of record," except for such restrictions as may be included in the Permitted Exceptions, (ii) the exception relating to

16

discrepancies, conflicts, boundary lines or any encroachment or any overlapping of improvements or other matters which a survey might show shall be modified to delete such exception, at Buyer's expense, nor shall there be any exceptions for easements, or claims of easements, not shown by the public records, (iii) the exception relating to ad valorem taxes shall except only to taxes owing for the current and subsequent years not yet due and payable, (iv) there shall be no exception for "parties in possession", and (v) the survey exception shall be removed and Seller shall provide an affidavit in a form acceptable to the Title Company and Buyer to effect such removal. Buyer shall pay for any requested endorsements to the Title Policies provided by Seller.

(d)     Within fifteen (15) days from the Effective Date, Buyer shall obtain current searches of all Uniform Commercial Code Financing statements filed with Office of the Texas Secretary of State, and the applicable County Clerk for each of the Owned Locations against Seller and Seller's predecessors in title reflecting all effective financing statements then of record relating to each of the Owned Locations or any part thereof.

### 5.6     Access and Inspection.

(a)     From the Effective Date until the Closing Date, Buyer and its Representatives shall, upon prior notice to Seller, be granted access during normal business hours and under reasonable circumstances to the Owned Locations, Persons and records of the Business including environmental records and Seller shall promptly furnish to Buyer all other information regarding the Business and its properties as Buyer may reasonably request to enable Buyer to evaluate the condition of the Assets and the representations made by Seller in this Agreement. From the Effective Date until the Closing Date, Seller shall grant to Buyer and its Representatives such right to enter and inspect the Owned Locations during normal business hours and under reasonable circumstances.

(b)     All such access and investigations shall be conducted in such a manner as not to interfere with the normal conduct of Seller's operations.

(c)     Buyer and its Representatives, at their sole cost, shall have the right to enter upon and make complete inspections of the Owned Locations, including conducting Phase II environmental site assessments to determine whether or not the Owned Locations are suitable, at Buyer's sole discretion, for its intended use. Such inspections may include structural, mechanical, electrical, engineering, tank and line tightness testing and environmental surveys, soil tests, analyses and examinations, and such other tests, studies, observations, analyses and examinations or studies that Buyer or its Representatives may deem necessary or desirable in connection with its evaluation of the Assets. If any damage to any Owned Location is caused by Buyer or its Representatives, Buyer shall be solely responsible for such damage and shall immediately repair and restore the Owned Location to its former condition, or, if such repair or restoration is not possible, then Buyer shall pay to Seller the loss in value of such Owned Location.

### 5.7     Allocation of Purchase Price.     The Purchase Price (and all other amounts treated as part of the Purchase Price for federal income tax purposes) shall be allocated among the Assets for federal tax purposes in accordance with the allocation set forth on Schedule 5.7 (the

17

"*Allocation Schedule*"). Seller and Buyer shall cooperate in good faith to adjust the Allocation Schedule to reflect any adjustment of the Purchase Price made in accordance with Article II above. At Closing, Seller and Buyer each shall prepare a mutually acceptable and substantially identical IRS Form 8594 "*Asset Acquisition Statements Under Section 1060*" which the Parties shall use to report the transactions contemplated by this Agreement to the applicable Taxing Authorities.   Each of Seller and Buyer shall provide the other promptly with any other information required to complete Form 8594. If any of the allocations determined pursuant to this Section 5.13 are disputed by any Governmental Authority, the Party receiving notice of such dispute shall promptly notify and consult with the other Parties concerning resolution of such dispute.

**5.8     Further Assurances.** Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at any Party's request and without further consideration, the other Party shall execute and deliver to such Party such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as such Party may reasonably request in order to consummate the transactions contemplated by this Agreement.

**5.9     Employees.** To the extent permitted by law, Seller shall provide access to complete personnel files for employees who work at or provide services for the Owned Locations, including, but not limited to, maintenance, sales and operations personnel, office, and image employees (the "*Employees*"). Buyer shall have the right to interview the Employees for possible employment by Buyer. Seller will permit Buyer to offer employment to some or all Employees who meet Buyer's standard employment criteria, including passing a pre-employment drug test. Buyer shall have full and absolute discretion in determining the terms, conditions, and benefits relating to such employment. Buyer shall coordinate through or with Seller on any contact by or communication from Buyer to the Employees and Seller shall fully and promptly cooperate with Buyer's requests. Nothing contained in this Agreement shall obligate Buyer to offer or continue the employment of any Employee. Seller will be responsible for all liabilities, obligations, and commitments relating to the compensation of the Employees for periods prior to the Closing Date.

**5.10     Notification of Certain Matters.** Seller shall give notice to Buyer and Buyer shall give notice to Seller, as promptly as reasonably practicable upon becoming aware of (a) any fact, change, condition, circumstance, event, occurrence or non-occurrence that has caused or is reasonably likely to cause any representation or warranty in this Agreement made by it to be untrue or inaccurate in any material respect at any time after the date hereof and prior to the Closing, (b) any material failure on its part to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder, or (c) the institution of or the threat of institution of any legal proceeding against Buyer or  Seller related to the transactions contemplated hereby; provided that the delivery of any notice pursuant to this Section 5.10 shall not limit or otherwise affect the remedies available hereunder to the party receiving such notice, or the representations or warranties of, or the conditions to the obligations of, the Parties.

**5.11     Assignment and 1031 Election.** Buyer may assign a portion of this Agreement to one or more Affiliates to purchase all or any portion of the Assets. Buyer (or any such assignee) may elect to purchase all or a portion of the Assets as a deferred tax-free exchange under the

18

Internal Revenue Code. Seller agrees to execute such documents that are necessary in connection with any such tax-free exchange and to otherwise cooperate with Buyer to effectuate such exchange. By acquiescence to the exchange, Seller shall not (i) have its rights under this Agreement affected or diminished in any manner, or (ii) be responsible for compliance with or be deemed to have warranted to the Buyer that the exchange in fact complies with Section 1031 of the Code.

**5.12 Transfer Fees and Taxes.** Except as otherwise set forth in this Agreement, Buyer shall be responsible for any applicable sales, use, stamp, documentary, filing, recording, transfer or similar fees or Taxes in connection with the transfer of the Assets. The Parties shall file all necessary documents (including all Tax Returns) with respect to all such amounts and provide necessary information in connection with such filings.

**5.13 Transition Efforts in Advance of Closing.** Between the expiration of the Due Diligence Period and Closing, Seller shall cooperate with Buyer to take reasonably necessary steps to ensure that the Assets will be transferred to Buyer at Closing with as little interruption of the Business following Closing as possible in the circumstances.

**5.14 Bankruptcy Matters.**

(a) Within fourteen (14) days after the Effective Date, Seller shall file a motion or motions in form mutually agreed upon by Seller and Buyer ("**Bid Procedures Motion**") setting forth bidding procedures (including the scheduling of an auction for the Assets) as described in Schedule 5.14(a), and seeking an order of the Bankruptcy Court approving such auction and bid procedures ("**Bid Procedures Order**"). In the event that a qualified bid is received from a third party, an auction will be held for the Assets with bidding in accordance with the Bid Procedures Order until the Seller determines the highest and best offer, subject to Bankruptcy Court approval (the "**Prevailing Bid**").

(b) Following the auction and determination of the Prevailing Bid, or the failure to receive any qualifying bids within the applicable timeframe set forth in the Bid Procedures Order, Seller will hold a hearing ("**Sale Hearing**") to seek a final order of the Bankruptcy Court approving the sale of the Assets based on the Prevailing Bid, or if no qualified bids were received, then pursuant to this Agreement ("**Sale Order**").

(c) In the event that a third party submits the Prevailing Bid and the Assets are sold to such third party instead of Buyer, then Seller agrees to pay to Buyer (i) a break-up fee equal to $840,000, plus (ii) reimbursement of up to $500,000 in actual out of pocket due diligence expenses incurred by Buyer under this Agreement (collectively, the "**Break-Up Fee**"), and return the Earnest Money to Buyer immediately following the entry of the order approving the Prevailing Bid. The Break-Up Fee shall be paid to Buyer upon closing of such sale to a third party.

19

## ARTICLE VI

### CONDITIONS TO OBLIGATIONS OF BUYER

Except as may be waived in writing by Buyer, the obligation of Buyer to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the following conditions:

**6.1** **Representations and Warranties.** The representations and warranties of Seller contained in this Agreement that are qualified by materiality or words of similar import shall be true and correct and those not so qualified shall be true and correct in all material respects, in each case as of the date of this Agreement, as of the date of termination or expiration of the Due Diligence Period and as of the Closing Date.

**6.2** **Performance.** Seller shall have delivered to Buyer all of the Closing Deliverables, performed in all material respects all obligations and complied with all covenants required by this Agreement to be performed or complied with by them at or before the Closing.

**6.3** **Sale Order.** The Bankruptcy Court shall have approved a Sale Order authorizing Seller to sell the Assets to Buyer on the terms of this Agreement, or if applicable, a Prevailing Bid submitted by Buyer.

**6.4** **Delivery of Instruments.** Seller shall have delivered to Buyer each of the Closing Deliverables.

**6.5** **Title Policies.** The Title Policies for the Owned Locations shall be delivered to Buyer.

## ARTICLE VII

### CONDITIONS TO OBLIGATIONS OF SELLER

Except as may be waived in writing by Seller, the obligation of Seller to consummate the transactions contemplated by this Agreement on the Closing Date shall be subject to the following conditions:

**7.1** **Representations and Warranties.** The representations and warranties of Buyer contained in this Agreement that are qualified by materiality or words of similar import shall be true and correct and those not so qualified shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing Date.

**7.2** **Performance.** Buyer shall have performed in all material respects all obligations and complied with all covenants required by this Agreement to be performed or complied with by it at or before the Closing.

**7.3** **Sale Order.** The Bankruptcy Court shall have approved a Sale Order authorizing Seller to sell the Assets to Buyer on the terms of this Agreement, or if applicable, a Prevailing Bid submitted by Buyer.

20

*7.4 Purchase Price.* Buyer shall have delivered to Seller the Purchase Price.

*7.5 Governmental Authorizations.* All orders, consents, permits, authorizations, approvals or waivers of any Governmental Authority required to be obtained by Buyer for the consummation of the transactions contemplated by this Agreement shall have been obtained, including the final Sale Order being approved by the Bankruptcy Court.

# ARTICLE VIII

## TERMINATION

*8.1 Termination.* This Agreement may be terminated by written notice given at or prior to Closing:

(a) By Seller if (i) Buyer fails to deposit the Earnest Money or (ii) Buyer shall materially default or breach with respect to the due and timely performance of any of Buyer's covenants and agreements set forth in this Agreement, or with respect to the correctness of or due compliance with any of Buyer's representations and warranties contained herein, and such default or breach cannot be cured within ten (10) days of written notice from Seller to Buyer and has not been waived, or (iii) Buyer excludes more than five (5) Owned Locations, or Owned Locations having an aggregate value under Schedule 2.4 in excess of $5 million, from the Assets pursuant to Section 2.5 below.

(b) By Buyer (i) during the Termination Period as set forth in Section 2.5(b) of this Agreement; or (ii) at any time, if Seller shall materially default or breach with respect to the due and timely performance of any of Seller's covenants and agreements set forth in this Agreement such default or breach cannot be cured within ten (10) days of written notice from Buyer to Seller and has not been waived, (iii) Seller materially defaults with respect to the correctness of or due compliance with any of Seller's representations and warranties contained herein, and such default or breach cannot be cured within ten (10) days of written notice from Buyer to Seller and has not been waived; or (iv) five or more Owned Locations are materially damaged, destroyed or taken by condemnation before the Closing Date to such an extent that business operations are unable to be maintained at such Owned Locations for a period of more than five (5) days.

(c) Upon any termination by Seller in accordance with Section 8.1(a)(ii), above, or if Buyer fails to close following the expiration or termination of the Due Diligence Period, Seller shall be entitled to retain the Earnest Money deposited by Buyer and to require that the same be released to Seller by the Title Company as Seller's sole and exclusive remedy. Upon any termination by Buyer in accordance with Section 8.1(b)(i) above, Buyer shall be entitled to a refund of the Earnest Money, less the sum of Ten Thousand and No/100 Dollars ($10,000.00), as independent consideration for Buyer's right to terminate this Agreement during the Termination Period (the *"Termination Fee"*). Upon any termination by Buyer in accordance with Section 8.1(b)(ii), Buyer shall be entitled to a refund of Earnest Money and Seller shall reimburse Buyer's actual out-of-pocket expenses (subject to a cap of $500,000) for conducting inspections, testing, surveys, and other due diligence as liquidated damages and this Agreement shall be null and void. In the event of a default or breach of Seller's covenants in this Agreement by Seller that results in the failure to consummate the Closing of the transactions contemplated

21

by this Agreement, then, in addition to any other rights or remedies Buyer may have at law or in equity, Buyer shall have the right to enforce specific performance of Seller's obligation to fulfill their Closing obligations pursuant to, and effect the transaction contemplated by, this Agreement.

(d)     In the event that Seller sells the Assets to a third party pursuant to a Prevailing Bid, then the other provisions of this Section 8.1 shall not apply, Buyer shall be refunded the Earnest Money, and Seller shall pay the Break-Up Fee to Buyer upon the closing of such sale to the third party, all as Buyer's sole and exclusive remedy in such event.

**8.2     *Representations and Warranties*.** The representations and warranties made by Seller in this Agreement shall be merged at Closing, shall not survive the Closing, and shall expire and terminate as of the Closing Date.

**8.3     *Limitation of Liability*.** NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, EXCEPT WITH REGARD TO FRAUD OR LOSSES ARISING IN CONNECTION WITH A THIRD PARTY CLAIM, NO PARTY SHALL BE LIABLE FOR EXEMPLARY OR PUNITIVE DAMAGES, WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, OTHER LAW OR OTHERWISE AND WHETHER OR NOT ARISING FROM THE OTHER PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT.   SELLER'S SOLE AND EXCLUSIVE REMEDY FOR ANY BREACH OF THE REPRESENTATIONS, WARRANTIES, COVENANTS, TERMS OR PROVISIONS OF THIS AGREEMENT PRIOR TO THE CLOSING DATE SHALL BE TO TERMINATE THIS AGREEMENT IN ACCORDANCE WITH SECTION 8.1 OF THIS AGREEMENT.

## ARTICLE IX

## MISCELLANEOUS

### 9.1     *Notices*.

(a)     Any notice or communication required or permitted hereunder shall be given in writing, sent by (a) personal delivery (provided by such delivery is confirmed by the courier delivery service), or (b) reputable overnight delivery services with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, addressed as follows:

If to Seller, to:

Aziz Convenience Stores, LLC
Attn: Douglas J. Brickley, CRO
1221 McKinney Street, Suite 2850,
Houston, Texas 77010

With a copy to:
(which shall not constitute Notice)

Okin & Adams LLP
Attn: Mathew Okin
1113 Vine St., Ste. 201
Houston, Texas 77002

22

If to Buyer, to:                                      SUNOCO LP
                                                      P.O. Box 9036
                                                      Corpus Christi, Texas 78469
                                                      Attn: Brad Williams


With a copy to:                                       SUNOCO LP
(which shall not constitute Notice)                   P. O. Box 9036
                                                      Corpus Christi, Texas 78469
                                                      Attn: Legal Department

or to such other address or to the attention of such other person as hereafter shall be designated in
writing by the applicable party sent in accordance herewith. Any such notice or communication
shall be deemed to have been given either (a) at the time of personal delivery or, (b) one business
day after being sent by overnight delivery service, or (c) three business days after deposit as
certified or registered mail, postage prepaid, with the United States Mail. Either party hereto
may change the address for notice specified above by giving the other party ten (10) days'
advance written notice of such change in address.

**9.2     *Entire Agreement.***     This Agreement supersedes all prior discussions and
agreements (including any letters of intent, term sheets, or similar documents) between the
Parties with respect to the subject matter hereof and contains the sole and entire agreement
between the Parties hereto with respect to the subject matter hereof.

**9.3     *Expenses.***     Except as otherwise expressly provided in this Agreement, whether or
not the transactions contemplated hereby are consummated, each Party will pay its own costs and
expenses incurred in anticipation of, relating to and in connection with the negotiation and
execution of this Agreement and the transactions contemplated hereby.

**9.4     *Waiver.***     Any term or condition of this Agreement may be waived at any time by
the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set
forth in a written instrument duly executed by or on behalf of the Party waiving such term or
condition. No waiver by any Party of any term or condition of this Agreement, in any one or
more instances, shall be deemed to be or construed as a waiver of the same or any other term or
condition of this Agreement on any future occasion.

**9.5     *Amendment.***     This Agreement may be amended, supplemented or modified only
by a written instrument duly executed by or on behalf of each Party.

**9.6     *No Third Party Beneficiary.***     Except as provided in Section 9.7, the terms and
provisions of this Agreement are intended solely for the benefit of the Parties and their respective
successors or permitted assigns, and it is not the intention of the Parties to confer third-party
beneficiary rights upon any other Person not a Party hereto, other than Persons who become
successors or assigns pursuant to the express terms of this Agreement.

**9.7     *Assignment; Binding Effect.***     Neither this Agreement nor any right, interest or
obligation hereunder may be assigned by any Party without the prior written consent of the other

23

Party, and any attempt to do so will be void, except for assignments and transfers by operation of Law; *provided, however,* that Buyer may assign its rights and obligations hereunder to an Affiliate of Buyer. Subject to this Section 9.7, this Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective successors and permitted assigns.

**9.8     *Invalid Provisions.*** If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any Party under this Agreement will not be materially and adversely affected thereby, such provision will be fully severable, this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

**9.9     *Governing Law.*** This Agreement shall be governed by and construed in accordance with the Laws of the State of Texas, without giving effect to any conflict or choice of law provision that would result in the imposition of another state's Law. Where required for proper interpretation, words in the singular shall include the plural.

**9.10     *Counterparts; Facsimile.*** This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Any facsimile, emailed, or other electronic copies hereof or signature hereon shall, for all purposes, be deemed originals.

**9.11     *Escrow.*** Title Company is authorized and agrees by acceptance thereof to hold the Earnest Money in escrow and to disburse it at Closing in accordance with the terms and conditions of this Agreement. In the event that Title Company is in doubt as to its duties or liabilities under the provisions of this Agreement, it may in its sole discretion continue to hold the monies which are the subject of this escrow until the Parties mutually agree to disbursement thereof, or until a judgment of the Bankruptcy Court or other court of competent jurisdiction shall determine the rights of the Parties thereto, or it may deposit all the monies then held pursuant to this Agreement with the clerk of the proper court of the county having jurisdiction of the dispute, and upon notifying all Parties concerned of such action, all liability on the part of Title Company shall fully cease and terminate, except to the extent of an accounting for any monies theretofore delivered out of escrow. In the event of any suit between Seller and Buyer wherein Title Company is made a party by virtue of acting as escrow agent hereunder, or in the event of any suit wherein Title Company interpleads the subject matter of this escrow, Title Company shall be entitled to recover reasonable attorney's fees and costs incurred, said fees and costs to be charged and assessed as court costs in favor of the prevailing party. The Parties agree that Title Company shall not be liable to any party or person whomsoever for misdelivery to Seller or Buyer of monies subject to this escrow, unless such misdelivery shall be due to willful breach of this Agreement or gross negligence on the part of Title Company.

**9.12   Drafting Party.** This Agreement expresses the mutual intent of the Parties to this Agreement. Accordingly, regardless of the drafting Party, the rule of construction against the drafting party shall have no application to this Agreement.

*[Signature Pages Follow]*

25

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each Party to be effective as of the date first above written.

**BUYER:**

**SUSSER PETROLEUM PROPERTY COMPANY LLC,**
**A Delaware limited liability company**

By: _____

Name: _Brad Williams_____

Title: _Executive Vice President_____

**SELLER:**

**AZIZ CONVENIENCE STORES, L.L.C.,**
**A Texas limited liability company**

By: _____
    Dagoberto Trevino, President

**AZIZ CONVENIENCE STORES NO. 4 L.P.,**
**A Texas limited partnership**

By:   **DST Management Services, L.L.C.,**
      **A Texas limited liability company**

By: _____
    Dagoberto Trevino, President

**AZIZ CONVENIENCE STORES NO. 5 L.P.,**
**A Texas limited partnership**

By:   **DST Management Services, L.L.C.,**
      **A Texas limited liability company**

By: _____
    Dagoberto Trevino, President

*Signature Page to Purchase and Sale Agreement*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each Party to be effective as of the date first above written.

**BUYER:**

**SUSSER PETROLEUM PROPERTY COMPANY LLC,**
**A Delaware limited liability company**

By:_____
Name:_____
Title: _____

**SELLER:**

**AZIZ CONVENIENCE STORES, L.L.C.,**
**A Texas limited liability company**

By:_____
        Dagoberto Trevino, President

**AZIZ CONVENIENCE STORES NO. 4 L.P.,**
**A Texas limited partnership**

By:    **DST Management Services, L.L.C.,**
        **A Texas limited liability company**

By:_____
        Dagoberto Trevino, President

**AZIZ CONVENIENCE STORES NO. 5 L.P.,**
**A Texas limited partnership**

By:    **DST Management Services, L.L.C.,**
        **A Texas limited liability company**

By:_____
        Dagoberto Trevino, President

*Signature Page to Purchase and Sale Agreement*

**AZIZ CONVENIENCE STORES NO. 6 L.P.,**
**A Texas limited partnership**

**By:**     **DST Management Services, L.L.C.,**
            **A Texas limited liability company**

By: _____
        Dagoberto Trevino, President


**AZIZ CONVENIENCE STORES NO. 8 L.P.,**
**A Texas limited partnership**

**By:**     **DST Management Services, L.L.C.,**
            **A Texas limited liability company**

By: _____
        Dagoberto Trevino, President


**AZIZ CONVENIENCE STORES NO. 9 L.P.,**
**A Texas limited partnership**

**By:**     **DST Management Services, L.L.C.,**
            **A Texas limited liability company**

By: _____
        Dagoberto Trevino, President


*Signature Page to Purchase and Sale Agreement*

**AZIZ CONVENIENCE STORES NO. 10 L.P.,**
**A Texas limited partnership**

**By:**     **DST Management Services, L.L.C.,**
            **A Texas limited liability company**

By: _____
            Dagoberto Trevino, President


**AZIZ CONVENIENCE STORES NO. 12 L.P.,**
**A Texas limited partnership**

**By:**     **DST Management Services, L.L.C.,**
            **A Texas limited liability company**

By: _____
            Dagoberto Trevino, President


**AZIZ CONVENIENCE STORES NO. 15 L.P.,**
**A Texas limited partnership**

**By:**     **DST Management Services, L.L.C.,**
            **A Texas limited liability company**

By: _____
            Dagoberto Trevino, President


*Signature Page to Purchase and Sale Agreement*

Schedule 2.1 (a) (i)
Owned Locations

[Attached]

Owner Function

| Title Search | Store # | Address | Abbreviated Legal | Hidalgo County Geographic ID | Hidalgo County Property ID | Owner Name (of Hidalgo County Tax Records) | Additional Address |
|---|---|---|---|---|---|---|---|

*(Table content illegible at available resolution.)*

Schedule 2.1 (a) (ii)
Personal Property and Equipment

[Attached]

Adit Convenience Stores
FSA Schedule 2 10/8/1  Personal Property and Equipment

10/16/2014

DRAFT

Protected by Attorney Work Product
Attorney-Client Communication
Privileged and Confidential

Schedule 2.1 (a) (iv)
Assumed Contracts

1. Lease Agreement – Vitamin Shack and Shakes (Seller shall use its best efforts to provide an estoppel certificate in form agreed by Seller and Buyer at least thirty (30) days before Closing).

2. Lease Agreement – Western Beverage Company (Seller shall use its best efforts to provide estoppel certificate in form agreed by Seller and Buyer at least thirty (30) days before Closing).

Schedule 2.1(b)
Excluded Assets

1. Ice Machines located at any Owned Locations.

2. ATM Machines located at any Owned Locations.

3. Any trucks or other vehicles used in connection with the operation of the Business or at any time located or stored on or at any Owned Locations.

4. All restaurant equipment located at the 708 Griffin Parkway, Mission, Texas location.

Schedule 2.3 (c)
Inventory Method


On the Closing Date, the parties (using a mutually agreed, independent third party provider) will inventory the Supplies Inventory and Merchandising Inventory, and will also inventory the Motor Fuels Inventories as follows: (1) motor Fuels Inventories, which include gasoline and diesel, will be determined by tank stick readings, with the tank stick readings to be converted to gallons based on the official tank chart for the tanks at the Owned Locations; (2) all motor fuel sales prior to the taking of tank stick readings will be for the account of Seller, and all motor fuel sales after the taking of tank stick readings will be for the account of Buyer; and (3) all Motor Fuels Inventory, including gasoline and diesel fuel, will be valued at the delivered cost and any applicable Taxes already paid by Seller for such Motor Fuels Inventory. Buyer shall provide Seller with appropriate documentation of Buyer's right to purchase the Motor Fuels Inventory from Seller on a Tax-free basis and Buyer will assume responsibility for submitting all Taxes to the appropriate Governmental Body. In the event Buyer fails to provide, or Seller reasonably determines that the Tax-free documentation of Buyer is not acceptable, the Motor Fuels Inventory shall be valued including all Taxes.

Schedule 2.4
Valuation Schedule

[Attached]

SCHEDULE 2.4
ALLOCATION OF PURCHASE PRICE

| A2IZ Store No. | Address | City | County | State | Zip | Total Value |
|---|---|---|---|---|---|---|
| 1 | 206 E. Expressway 83 | La Joya | Hidalgo | TX | 78560 | $900,000.00 |
| 2 | 3700 W Expressway 83 (aka 101 Bentsen Palm Dr) | Mission | Hidalgo | TX | 78572 | $434,920.00 |
| 3 | 600 E Bus 83 | San Juan | Hidalgo | TX | 78589 | $1,100,000.00 |
| 4 | 708-710 W. Griffin Parkway | Mission | Hidalgo | TX | 78572 | $1,200,000.00 |
| 5 | 824 W. Ferguson (aka 1901 Tesoro Blvd) | Pharr | Hidalgo | TX | 7857 | $1,200,000.00 |
| 6 | 6506 S. Cage Blvd | Pharr | Hidalgo | TX | 78577 | $1,300,000.00 |
| 7 | 1406 W. Nolana Loop | Pharr | Hidalgo | TX | 78577 | $524,440.00 |
| 8 | 2831 W. Highway 83 | McAllen | Hidalgo | TX | 78501 | $586,880.00 |
| 9 | 800 E. Expressway 83 | Sullivan City | Hidalgo | TX | 78595 | $1,580,000.00 |
| 10 | 1409 E. Ridge Road | McAllen | Hidalgo | TX | 78503 | $1,100,000.00 |
| 11 | 9927 SH 107 (aka 9927 N. Conway Ave) | McAllen | Hidalgo | TX | 78573 | $720,000.00 |
| 12 | 409 W. Highway 83 | Donna | Hidalgo | TX | 78537 | $1,150,000.00 |
| 13 | 1452 W. FM 495 | Alamo | Hidalgo | TX | 78516 | $466,360.00 |
| 14 | 1512-1514 E. Bus 83 | Mission | Hidalgo | TX | 78572 | $398,240.00 |
| 15 | 802-900 N. Jackson | Pharr | Hidalgo | TX | 78577 | $1,080,000.00 |
| 16 | 3000 N. Ware Road | McAllen | Hidalgo | TX | 78501 | $1,150,000.00 |
| 17 | 911 W. FM 495 (aka 1500 N I RD) | San Juan | Hidalgo | TX | 78589 | $1,130,000.00 |
| 18 | 523 W. Main Street | Alton | Hidalgo | TX | 78572 | $1,150,000.00 |
| 19 | 10500 S. Cage | Pharr | Hidalgo | TX | 78577 | $1,000,000.00 |
| 20 | 6220 Nth La Homa Road | Mission | Hidalgo | TX | 78574 | $1,280,000.00 |
| 21 | 1101 W. Highway 83 | Alamo | Hidalgo | TX | 78572 | $581,640.00 |
| 22 | 1510 W. Monte Cristo | Edinburg | Hidalgo | TX | 78516 | $1,400,000.00 |
| 23 | 3801 W. 3 Mile Road | Mission | Hidalgo | TX | 78539 | $907,320.00 |
| 25 | 1524 Nolana Loop (aka 1524 Earling) | Pharr | Hidalgo | TX | 78577 | $550,200.00 |
| 26 | 6601 6609 & 6707 S. Jackson Road | Pharr | Hidalgo | TX | 78577 | $1,440,000.00 |
| 27 | 1603 W. University Drive | Edinburg | Hidalgo | TX | 78539 | $1,700,000.00 |
| 33 | 5302 E. Highway 107 | Edinburg | Hidalgo | TX | 78577 | $700,000.00 |
| 34 | 6220 N. Shary Road | Edinburg | Hidalgo | TX | 78573 | $1,210,000.00 |
| | | | | | | $28,000,000.00 |

Schedule 2.5 (a)
Due Diligence Deliverables

[Attached]

Schedule 2.5 (a)
Due Diligence Deliverables

a. The Financial Statements and Location Operating Statements. Additional interim monthly Location Operating Statements will be provided as months are closed.

b. Copies of existing title policies, Leases, access agreements, surveys and environmental reports (phase I, phase II, release detection results, letters from TCEQ, tank and line testing results, etc.) for each Owned Location.

c. Schedule of any current or potential claims or litigation from third parties against Sellers.

d. Copies of all commission agreements, employment agreements, non-compete agreements or confidentiality agreements with current or former Employees or other third party.

e. With respect to motor fuel equipment at each Owned Location, the following:

   i.    Brand/model of ATG.
   ii.   Brand/manufacturer of flexible piping.
   iii.  Brand of dispenser.
   iv.   Brand/model of POS system.
   v.    Presence of secondary containment under dispensers and STP's.
   vi.   Presence of sump sensors and type (discriminating and non-discriminating).
   vii.  Brand/manufacture/material/specifications of piping.

f. Schedule of Owned Locations with active water wells or septic systems and, if any, copies of applicable Permits.

g. Schedule of Owned Locations currently being investigated for a suspected release, or are included in a TCEQ enforcement action, or have received a poor performance rating for compliance history.

h. Copies of all Permits.

i. Copy of most recent fuel tax return and sales tax return for each state where Sellers operate.

j. Schedule of inside sales, fuel volumes, and any other revenue for each of the Owned Locations for the last twelve months.

## Schedule 3.9
### Permits; Compliance

Health Permits (issued by Cities or Counties)

Texas Sales and Use Tax Permit

Texas Alcohol and Beverage Commission - Wine & Beer Off Premise Permits

Texas Department of State Health Services - Volatile Chemical Sales Permits

Texas Department of Agriculture - Weights and Measures Device Details Certificate

TCEQ Petroleum Storage Tank Program - Delivery Certificate

<u>Schedule 3.10(a)</u>
Seller Operated USTs


[Attached]

10/16/2014

DRAFT

**ADE Convenience Stores**
**PSA Schedule 3.10(d) - UST Details**

| Address | Tank Installation Date | Tank Size | Tank Type | # of Tanks | Tank Monitor System | Piping | Line & Leak Detector First Results Available | TC41 Penetration Design Task First Available | TC42 Notice of Stationary Tank Acceptance Available |
|---|---|---|---|---|---|---|---|---|---|
| 204 E Expressway 83, La Joya, TX 78560 | 5/1/2003 | 2 - 15,000 (6 - 10,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 2700 W Expressway 83, Mission, TX 78572 (AKA 401 Veterans Palm Drive) | 9/1/1993 | 3 - 12,000 10,000, 10,000 | Single Wall Steel Coating | 3 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 6005 Bus 83, San Juan, TX 78589 | 9/24/1996 | 3 - 15,000, 10,000 | Single Wall Steel Coating | 3 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 703-710 W Griffin Parkway, Mission, TX 78572 | 5/18/1999 | 2 - 15,000, 10,000 | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 824 W Ferguson, Pharr, TX 78577 (AKA 1901 Fresno Blvd) | 6/25/1999 | 2 - 15,000 (6 - 10,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 6006 S Cage Blvd, Pharr, TX 78577 | 10/1/1999 | 2 - 15,000 (6 - 10,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 1408 W Polk Ave Loop, Pharr, TX 78577 | 9/1/1999 | 2 - 15,000 (6 - 10,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 2331 W Highway 83, McAllen, TX 78501 | 2/28/2000 | 2 - 15,000 (6 - 10,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 6201 Expressway 83, Sullivan City, TX 78595 | 1/17/2000 | 2 - 15,000 (6 - 10,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 1409 E Ridge Road, McAllen, TX 78503 | 4/28/2000 | 2 - 15,000 (6 - 10,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 3927 S Hwy 281, McAllen, TX 78573 (AKA 3927 N Conway Ave) | 9/25/2001 | 3 - 15,000 (6 - 10,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 3 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 409 W Highway 83, Donna, TX 78537 | 2/14/2001 | 2 - 15,000 (6 - 10,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 1451 W FM 495, Alamo, TX 78516 | 8/6/2002 | 2 - 15,000 (6 - 15,000 & 1 Split 7,500/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 1511-1514 E Bus 83, Weslaco, TX 78501 | 1/14/2003 | 2 - 15,000 (6 - 15,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 660-700 N Jackson, Pharr, TX 78577 | 1/14/2003 | 2 - 15,000 (6 - 15,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 3000 W Wayne Road, McAllen, TX 78520 | 1/1/2003 | 2 - 15,000 (1 - 15,000 & 1 Split 7,000/8,000) | 1-1/k Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 911 W FM 495, San Juan, TX 78589 (AKA 1500 N 10) | 7/1/2003 | 2 - 15,000 (1 - 15,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 323 W Main Street, Alton, TX 78572 | 11/24/2003 | 2 - 15,000 (1 - 15,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 6220 McHale Road, McAllen, TX 78514 | 6/1/2004 | 2 - 20,000 (1 - 20,000 & 1 Split 10,000/10,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 1101 W Highway 83, Alamo, TX 78577 | 12/31/1998 | 2 - 12,000 (1 - 10,000 & 1 Split 7,000/8,000) | Double Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 1110 W Houston Circle, Edinburg, TX 78539 | 7/1/2003 | 2 - 15,000 (1 - 15,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 3803 W Mile Road, Mission, TX 78573 | 5/1/2003 | 2 - 15,000 (1 - 15,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 1324 Nolana Loop, Pharr, TX 78577 (AKA 1324 Suffing) | 1/26/2003 | 2 - 15,000 (1 - 15,000 & 1 Split 3,000/3,075) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 6601-6609 & 6707 S Jackson Road, Pharr, TX 78577 | 9/1/2005 | 2 - 15,000 (1 - 15,000 & 1 Split 7,000/8,075) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 1403 W University Drive, Edinburg, TX 78539 | 10/11/2005 | 2 - 15,000 (1 - 15,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 5301 E Highway 107, Edinburg, TX 78577 | 6/1/2008 | 2 - 15,000 (1 - 15,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |
| 6230 N Shary Road, Edinburg, TX 78573 | 8/11/2008 | 2 - 15,000 (1 - 15,000 & 1 Split 7,000/8,000) | Single Wall Steel Coating | 2 | Yes | Single Wall FRB Piping | Yes | Yes | Yes |

Privileged and Confidential
Protected by Attorney Work Product
Attorney Client Communication

Schedule 3.10(d)
Environmental (LPST) Claims/Locations

1. Store 21; 1101 W Highway 83, Alamo, TX 78572:

   Corrective Action Requirement for Former Sandoval Used Cars; Letter from November 5, 2014 - requests additional assessment to delineate the dissolved phase plume and perform groundwater monitoring to establish dissolved phase plume stability. At completion of the delineation a risk-based report (Assessment Report Form ARF) should be submitted. Seller has a proposal from Environmental Risk Management to complete the additional assessment.

2. Data Room:

   Reference is hereby made to all information contained in the Phase 1 Environmental Reports, Supplemental Environmental Documentation (Store 21), Observation Well Screening reports, and any other environmental documentation and information available in Seller's Data Room as of the Effective Date.

## Schedule 3.11
### Insurance Policies

Commercial Property - Axis Surplus Insurance Company

Employee Workers Compensation and Employer Liability Insurance Policy - Texas Mutual Insurance Company

Commercial General Liability - Scottsdale Insurance Company

Liquor Liability - United States Liability Insurance Company

Storage Tank Liability Insurance Policy - ACE American Insurance Company

<u>Schedule 5.7</u>
Allocation Schedule


[Attached]

**SCHEDULE 5.7**
**ALLOCATION OF PURCHASE PRICE**

| A2IZ Store No. | Address | City | County | State | Zip | Land Value | Improvement Value | Petroleum Equipment Value | C-Store Equipment Value | Total Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 206 E. Expressway 83 | La Joya | Hidalgo | TX | 78560 | $642,000.00 | $178,000.00 | $60,000.00 | $20,000.00 | $900,000.00 |
| 2 | 3700 W Expressway 83 (aka 101 Bentsen Palm Dr) | Mission | Hidalgo | TX | 78572 | $324,000.00 | $80,920.00 | $20,000.00 | $10,000.00 | $434,920.00 |
| 3 | 600 E Bus 83 | San Juan | Hidalgo | TX | 78589 | $430,000.00 | $510,000.00 | $120,000.00 | $40,000.00 | $1,100,000.00 |
| 4 | 708-710 W. Griffin Parkway | Mission | Hidalgo | TX | 78572 | $540,000.00 | $500,000.00 | $120,000.00 | $40,000.00 | $1,200,000.00 |
| 5 | 824 W. Ferguson (aka 1901 Tesoro Blvd) | Pharr | Hidalgo | TX | 7857 | $600,000.00 | $440,000.00 | $120,000.00 | $40,000.00 | $1,200,000.00 |
| 6 | 6506 S. Cage Blvd | Pharr | Hidalgo | TX | 78577 | $775,000.00 | $365,000.00 | $120,000.00 | $40,000.00 | $1,300,000.00 |
| 7 | 1406 W. Nolana Loop | Pharr | Hidalgo | TX | 78577 | $350,000.00 | $144,440.00 | $20,000.00 | $10,000.00 | $524,440.00 |
| 8 | 2831 W. Highway 83 | McAllen | Hidalgo | TX | 78501 | $408,380.00 | $148,500.00 | $20,000.00 | $10,000.00 | $586,880.00 |
| 9 | 800 E. Expressway 83 | Sullivan City | Hidalgo | TX | 78595 | $890,000.00 | $530,000.00 | $120,000.00 | $40,000.00 | $1,580,000.00 |
| 10 | 1409 E. Ridge Road | McAllen | Hidalgo | TX | 78503 | $923,500.00 | $146,500.00 | $20,000.00 | $10,000.00 | $1,100,000.00 |
| 11 | 9927 SH 107 (aka 9927 N. Conway Ave) | McAllen | Hidalgo | TX | 78573 | $492,000.00 | $148,000.00 | $60,000.00 | $20,000.00 | $720,000.00 |
| 12 | 409 W. Highway 83 | Donna | Hidalgo | TX | 78537 | $480,000.00 | $510,000.00 | $120,000.00 | $40,000.00 | $1,150,000.00 |
| 13 | 1452 W. FM 495 | Alamo | Hidalgo | TX | 78516 | $287,860.00 | $148,500.00 | $20,000.00 | $10,000.00 | $466,360.00 |
| 14 | 1512-1514 E. Bus 83 | Mission | Hidalgo | TX | 78572 | $293,240.00 | $75,000.00 | $20,000.00 | $10,000.00 | $398,240.00 |
| 15 | 802-900 N. Jackson | Pharr | Hidalgo | TX | 78577 | $500,000.00 | $420,000.00 | $120,000.00 | $40,000.00 | $1,080,000.00 |
| 16 | 3000 N. Ware Road | McAllen | Hidalgo | TX | 78501 | $640,000.00 | $350,000.00 | $120,000.00 | $40,000.00 | $1,150,000.00 |
| 17 | 911 W. FM 495 (aka 1500 N I RD) | San Juan | Hidalgo | TX | 78589 | $500,000.00 | $530,000.00 | $120,000.00 | $40,000.00 | $1,190,000.00 |
| 18 | 523 W. Main Street | Alton | Hidalgo | TX | 78572 | $475,000.00 | $515,000.00 | $120,000.00 | $40,000.00 | $1,150,000.00 |
| 19 | 10500 S. Cage | Pharr | Hidalgo | TX | 78577 | $675,000.00 | $295,000.00 | $20,000.00 | $10,000.00 | $1,000,000.00 |
| 20 | 6220 Nth La Homa Road | Mission | Hidalgo | TX | 78574 | $725,000.00 | $395,000.00 | $120,000.00 | $40,000.00 | $1,280,000.00 |
| 21 | 1101 W. Highway 83 | Alamo | Hidalgo | TX | 78572 | $350,000.00 | $201,640.00 | $20,000.00 | $10,000.00 | $581,640.00 |
| 22 | 1510 W. Monte Cristo | Edinburg | Hidalgo | TX | 78516 | $875,000.00 | $365,000.00 | $120,000.00 | $40,000.00 | $1,400,000.00 |
| 23 | 3801 W. 3 Mile Road | Mission | Hidalgo | TX | 78539 | $650,000.00 | $227,320.00 | $20,000.00 | $10,000.00 | $907,320.00 |
| 25 | 1524 Nolana Loop (aka 1524 Earling) | Pharr | Hidalgo | TX | 78577 | $425,000.00 | $95,200.00 | $20,000.00 | $10,000.00 | $550,200.00 |
| 26 | 6601-6609 & 6707 S. Jackson Road | Pharr | Hidalgo | TX | 78577 | $750,000.00 | $530,000.00 | $120,000.00 | $40,000.00 | $1,440,000.00 |
| 27 | 1603 W. University Drive | Edinburg | Hidalgo | TX | 78539 | $975,000.00 | $565,000.00 | $120,000.00 | $40,000.00 | $1,700,000.00 |
| 33 | 5302 E. Highway 107 | Edinburg | Hidalgo | TX | 78577 | $525,000.00 | $145,000.00 | $20,000.00 | $10,000.00 | $700,000.00 |
| 34 | 6220 N. Shary Road | Edinburg | Hidalgo | TX | 78573 | $675,000.00 | $375,000.00 | $120,000.00 | $40,000.00 | $1,210,000.00 |
| | | | | | | $16,175,980.00 | $8,934,020.00 | $2,140,000.00 | $750,000.00 | $28,000,000.00 |

Schedule 5.14(a)
Bid Procedures

[Attached]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 14-70427 |
| AZIZ CONVENIENCE STORES, L.L.C., | § | |
| | § | Chapter 11 |
| Debtor. | § | |

### BID PROCEDURES

Set forth below are the bid procedures (the "Bid Procedures") to be employed with respect to the proposed sale (the "Proposed Sale") of assets of Aziz Convenience Stores, L.L.C., as debtor-in-possession (the "Debtor" or "Sellers") in the Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court," Case No. 14- 70427 (the "Bankruptcy Case")). The Debtor will seek entry of an order from the Bankruptcy Court authorizing and approving the Proposed Sale to the Proposed Purchaser (defined below) or another Qualified Bidder (defined below) that is determined to have made the highest or otherwise best offer (the "Sale Transaction"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Purchase and Sale Agreement (defined below).

### Purchase and Sale Agreement

The Debtor has entered into a Purchase and Sale Agreement (the "Purchase and Sale Agreement") with Susser Petroleum Property Company LLC (the "Buyer" or "Proposed Purchaser"). Pursuant to the Purchase and Sale Agreement, the Buyer proposes to acquire substantially all of the assets of the Debtor free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests therein or thereon to the maximum extent permitted by the Bankruptcy Code (collectively, the "Interests"), the "Assets" as set forth in the Purchase and Sale Agreement attached hereto as **Exhibit 1**.

### Bidding Procedures Motion and Order

On May 1, 2015, the Debtor filed a Motion for Entry of an Order (A) Approving Bidding Procedures in Connection with Sale of Certain of the Debtor's Assets, (B) Scheduling an Auction; and (C) Granting Related Relief (the "Bid Procedures Motion"). The relief requested in the Bid Procedures Motion and as provided in the Purchase and Sale Agreement, was approved and authorized by the Bankruptcy Court by an order entered by the Court on May __, 2015 (the "Bid Procedures Order").

### The Bidding Process

The Debtor and its advisors shall (i) determine whether any bid for the Assets is a Qualified Bid (defined below), (ii) coordinate efforts of Interested Parties (as defined below) in conducting their due diligence investigations, (iii) receive offers from Potential Bidders, and (iv)

negotiate in good faith any offers made to purchase the Assets (collectively, the "Bidding Process").

## Due Diligence

Any person interested in receiving confidential information from the Debtor in connection with the Bidding Process must sign a nondisclosure agreement reasonably satisfactory to the Debtor. Upon signing a nondisclosure agreement, a party shall be considered a "Potential Bidder." The Debtor shall afford each Potential Bidder reasonable time and the opportunity to conduct reasonable due diligence; provided, however, that the Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline (defined below).

All reasonable requests for additional information and due diligence access from Potential Bidders shall be directed to the Debtor's investment banker:

> Keen-Summit Capital Partners LLC
> 10 East 53rd Street, 28th Floor
> New York, NY 10022
> ATTN: Harold Bordwin and Heather Milazzo
> Telephone: 646-381-9222
> Email: hbordwin@keen-summit.com and
> hmilazzo@keen-summit.com

Except as may be provided by an order of the Bankruptcy Court, neither the Debtor nor any representative is obligated to furnish any information to any person other than a Potential Bidder. If the Debtor provides any due diligence materials to a Potential Bidder, and such materials have not previously been provided to the other Potential Bidders, including the Proposed Purchaser, then the Debtor shall provide email notice of such posting to all Potential Bidders, including the Proposed Purchaser and make such materials reasonably available to the other Potential Bidders. Notwithstanding anything herein to the contrary, the Debtor reserves the right to withhold information or restrict access to certain materials in any data room if providing such information or materials to a Potential Bidder will, in the Debtor's business judgment put the Debtor at a competitive disadvantage.

## Bid Deadline

Unless otherwise agreed to in writing in advance by the Debtor, any Potential Bidder that desires to make a competing bid shall email or deliver written copies of its bid (inclusive of Good Faith Deposit) not later than **3:00 p.m. (CST) on July 15, 2015** (the "Bid Deadline") to Debtor's counsel:

> Okin & Adams LLP
> 1113 Vine St., Suite 201
> Houston, Texas 77002
> ATTN: Matthew S. Okin
> mokin@okinadams.com

with a copy to:

Keen-Summit Capital Partners LLC
10 East 53rd Street, 28th Floor
New York, NY 10022
ATTN: Harold Bordwin and Heather Milazzo
hbordwin@keen-summit.com and
hmilazzo@keen-summit.com

**Bid Requirements**

All competing bids must include (unless such requirement is waived by the Debtor) the following documents and requirements (the "Bid Requirements"):

(1) an offer to purchase substantially all of the Assets (or an offer to purchase less than substantially all of the Assets or such other assets on terms that, in the Debtor's business judgment, are no less favorable than the terms and conditions set forth in the Purchase and Sale Agreement) upon the terms and conditions as substantially set forth in the Purchase and Sale Agreement, including without limitation, with respect to certainty and timing of closing, or upon alternative terms and conditions that the Debtor determines in its reasonable business judgment are no less favorable than the terms and conditions set forth in the Purchase and Sale Agreement;

(2) a purchase price of at least $29,600,000 (which shall be the "Initial Incremental Bid Amount")[1];

(3) a letter stating that the Potential Bidder's offer is irrevocable until two (2) business days after the Assets have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court;

(4) a redline comparing the Potential Bidder's proposed purchase agreement against that of the Purchase and Sale Agreement;

(5) a good faith deposit in the amount of $1,480,000 (the "Good Faith Deposit") submitted to an escrow agent reasonably determined by the Debtor ("Escrow Agent") and a letter stating that the Debtor may retain (and the Escrow Agent may deliver to the Debtor) the Good Faith Deposit if the Potential Bidder is selected by the Bankruptcy Court as the Successful Bidder or Back Up Bidder and thereafter there occurs a default by such Potential Bidder under such Potential Bidder's purchase agreement;

(6) must not be conditioned on financing contingencies or the outcome of due diligence by the Potential Bidder and must include an acknowledgement and representation as

---

[1] All Qualifying Bids must also unconditionally agree to pay the Inventory Payment (as defined in section 2.3(c) of the Purchase and Sale Agreement). At its discretion, the Seller may choose not to accept a bid modifying the terms of the Inventory Payment or may require a higher Initial Incremental Bid Amount.

described herein that the Potential Bidder had an opportunity to conduct any and all required due diligence prior to making its bid;

(7) fully discloses the identity of each entity that will be bidding for all or any portion of the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation, including the identification of the Potential Bidder's principal advisors;

(8) written evidence of a commitment for financing or other evidence of ability to consummate the transaction.

A bid received from a Potential Bidder by the Bid Deadline that satisfies all of the Bid Requirements shall be a "Qualified Bid," and at such time the Debtor, shall designate the Potential Bidder a qualified bidder ("Qualified Bidder"). The Proposed Purchaser is a Qualified Bidder, and the Purchase and Sale Agreement is a Qualified Bid.

Debtor reserves the right to reasonably request additional information from a Bidder and from a Qualified Bidder which would enable Seller to evaluate, among other things, the Bidder's ability to consummate a transaction, the Bidder's legal authority to Bid, and/or the Bidder's ability to fulfill its obligations in connection therewith. A Bidder's or Qualified Bidder's failure to timely respond to such requests may result in such Bidder or Qualified Bidder being disqualified.

Confidentiality: By submitting a Bid, each Bidder agrees to maintain as confidential and to not disclose to third parties both the fact that Bidder submitted a Bid and the terms and conditions of such Bid.

**"As Is, Where Is"**

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents or its estates except to the extent set forth in the Purchase and Sale Agreement or the purchase agreement of another Successful Bidder. By submitting a bid, the Proposed Purchaser and each other Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or, (i) as to the Proposed Purchaser, as expressly stated in the terms of the sale of the Assets set forth in the Purchase and Sale Agreement and ancillary documents, or (ii) as to another Successful Bidder, as expressly stated in the terms of the sale of the Assets set forth in the applicable purchase agreement and ancillary documents. By submitting a bid, the Proposed Purchaser and each other Qualified Bidder shall be deemed to acknowledge that it is bound by these procedures and has consented to the core jurisdiction of the Bankruptcy Court in connection with any disputes

4

related to the sale process described herein and the construction and enforcement of any transaction documents relating to its bid.

## Free of Any And All Interests

Except as otherwise provided in the Purchase and Sale Agreement or another Successful Bidder's purchase agreement, all of the Debtor's right, title and interest in the Assets shall be sold free and clear of all Interests thereon and there against to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Interests applied against the Assets.

## Auction, Bidding Increments and Bids Remaining Open

If more than one Qualified Bid has been received by the Debtor (including the Purchase and Sale Agreement), the Debtor shall conduct an auction (the "Auction") with respect to the Assets. The Auction shall commence at 9:00 a.m. **(CST) on July 20, 2015** at the offices of Atlas Hall & Rodriguez, LLP, 818 Pecan, McAllen, TX 78501. The Debtor shall notify all Qualified Bidders that have submitted Qualified Bids of the time of the Auction.

The Seller reserves the right to change the location and time of the Auction upon timely and appropriate notice to the Qualified Bidders and any other party requesting notice.

The Auction shall be conducted in accordance with the following procedures:

Only the Debtor, the Proposed Purchaser, and any Qualified Bidders (and the advisors to each of the foregoing) shall be entitled to attend the Auction and only the Proposed Purchaser and such Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction.

At the Auction, all Qualified Bidders shall be permitted to improve their Qualified Bids in accordance with the procedures set forth herein (each, a "Subsequent Bid"). All Subsequent Bids presented during the Auction shall be made and received in one room on an open basis. All participating Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each participating Qualified Bidder shall be fully disclosed to all other Qualified Bidders and that all material terms of each Subsequent Bid presented during the Auction will be fully disclosed to the Proposed Purchaser, all other participating Qualified Bidders and other parties in attendance throughout the entire Auction.

All Qualified Bidders at the Auction must have at least one individual representative with authority to bind such Qualified Bidder present in person at the Auction.

All proceedings at the Auction shall be conducted before and transcribed by a court stenographer.

At least one (1) day prior to the Auction, the Debtor will advise the Proposed Purchaser and all other Qualified Bidders which Qualified Bid the Debtor has determined in its reasonable business judgment constitutes the then highest or otherwise best offer for the Assets (the "Starting Bid").

Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round (a) at least one Subsequent Bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid and meets the overbid requirement set forth below, and (b) the Debtor determines, in its reasonable business judgment that a Subsequent Bid is a higher or otherwise better offer than the then current leading Qualified Bid.

Bidding at the Auction shall be in increments of no less than $100,000 and shall continue until such time as the highest and best bid is determined by the Debtor in its reasonable business judgment. For the purpose of evaluating the value of the consideration provided by each bid (including any Subsequent Bid by the Proposed Purchaser) presented at the Auction, the Debtor may take into consideration, among other things, price, modifications to the Purchase and Sale Agreement, closing risk, risk of delay, financial condition, experience, the mix of cash payable at closing verses other forms of consideration, whether the consideration is payable at the closing or over time, the financial and contractual terms as well as factors relevant to the sale process, including any issues affecting the speed and certainty of consummating the proposed sale or antitrust or unfair competition issues, and any other factors which the Debtor may consider.

After each round of bidding, the Debtor shall announce the Qualified Bid or Subsequent Bid, as the case may be, that the Debtor has determined to be in its reasonable business judgment, to be the then highest or otherwise best bid (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has an opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. The Auction will continue until no other Qualifying Bidder wishes to increase its bid above the previous bid.

At the conclusion of the Auction, the Debtor will announce the Qualified or Subsequent Bid which it has determined in its reasonable business judgment to be the highest or otherwise best bid (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder") and such Successful Bid will be submitted to the Court for approval at the Sale Hearing (defined below), along with which Qualified Bid or Subsequent Bid the Debtor has determined in its reasonable business judgment to be the second highest and best Qualified Bid (the "Back-Up Bid").

Immediately prior to the adjournment of the Auction, the Successful Bidder, if it has not already done so, shall complete and sign all agreement(s), contract(s), instrument(s) or other document(s) evidencing and containing the terms and conditions upon which such bid was made.

The Debtor shall file with the Court a notice of the Successful Bid (the "Supplement") by **12:00 p.m. (CST), July 22, 2015.** The Supplement may be obtained from counsel of the Debtor upon written request to Okin & Adams LLP, (Attn: Matthew S. Okin), counsel for the Debtor. The Supplement shall identify, among other things: (a) the Successful Bidder; (b) the bidder that presented the Back-Up Bid; (c) the consideration to be paid for the Assets; (d) the executory contracts or leases to be assumed and assigned to the Successful Bidder in connection with the sale of the Assets; (e) the liabilities to be assumed by the Successful Bidder in connection with the sale of the Assets; and (f) copies of the respective purchase agreement entered into by the Successful Bidder and the Back-Up Bidder.

## Acceptance of Qualified Bids

The Debtor shall sell the Assets to a Qualified Bidder only upon the approval of the sale by the Bankruptcy Court after a hearing (the "Sale Hearing"). The Debtor's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of the Qualified Bid. The Debtor will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing. All rights of interested parties to object to the Debtor' selection of the Successful Bidder and/or Back Up Bidder at the Sale Hearing are reserved; any such party may assert that based on the mix of cash payable at closing verses other forms of consideration, the timing of payments contemplated by the parties identified by the Debtor as the Successful Bidder and/or Back Up Bidder and/or other factors, an alternative proposal should be selected and designated the Successful Bid and/or Back-Up Bid.

The Successful Bidder shall supplement its Deposit so that immediately following the Auction, its aggregate deposit being held by Seller equals five percent (5%) of the Successful Bid.

All supplemental Deposits shall be paid in certified funds or bank cashiers check made payable to the Debtor's chosen escrow agent.

The establishment of a Successful Bid and a Back-up Bid does not release any Bidder from its obligations and all Bids remain open and irrevocable until 2 days after the closing

## Objection Deadline

Objections to any aspect of the proposed Sale Transaction, including the proposed assumption or assignment of any contract or lease or the proposed cure amounts for any such contract or lease, must be filed with the Court and served on the attorneys for the Debtor, attorneys for PCB, the attorneys for the Successful Bidder, and attorneys for the Proposed Purchaser by **5:00 p.m. (CST), July 24, 2015**.

## Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court at **[___:00 a.m./p.m. (CST), _____, 2015]**. Following the approval of the sale of the Assets to the party

7

designated the Successful Bidder by the Court at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale, the Debtor shall be authorized, but not required, to deem the Back-Up Bid, as designated by the Court at the Sale Hearing, the Successful Bid, the Debtor shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court, and the Debtor shall have reserved all rights to seek damages against any Successful Bidder that defaults under its purchase agreement and/or otherwise fails to consummate an approved sale.

## Modifications

The Debtor may (i) determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (c) contrary to the best interests of the Debtor, the Debtor's estates and creditors. Notwithstanding any other provision of these procedures, the Debtor, shall have the right to modify (a) any bidding or objection deadline described herein, and (b) the procedures to be used in any auction as set forth in these procedures.

Exhibit A
Seller's Certification

**SELLERS CERTIFICATION**

Pursuant to the provisions of that certain Purchase and Sale Agreement dated effective _____ ___, 2015 (the "*PSA*") by and between **AZIZ CONVENIENCE STORES, L.L.C.** ("*Seller*") and Susser Petroleum Property Company, a Delaware limited liability company, ("*Buyer*").

We, _____, Chief Executive Officer and _____ , Chief Financial Officer of Seller, do hereby certify that as of, _____ ____, 2015 the date of termination/expiration of the Due Diligence Period (as defined in the PSA):

1. All representations and warranties of Seller contained in the PSA remain true and correct in all material respects.

2. Seller has performed its obligations in accordance with the covenants set forth in Sections 5.1 (*Conduct of Business*) and 5.2 (*Records and Reports*) of the PSA.

3. Seller has delivered all Due Diligence Deliverables.

All terms in this Seller Certification which are defined terms under the PSA shall have the same meaning as said terms have in the PSA, unless otherwise provided herein.

IN WITNESS WHEREOF, this Certification has been duly executed and delivered by Seller as of the date first above written.

**SELLER:**

**AZIZ CONVENIENCE STORES, L.L.C.**

By:_____ _____ _____
Name:_____ _____
Title:_____ _____

Exhibit B
Special Warranty Deed

## SPECIAL WARRANTY DEED

STATE OF TEXAS     §
                     §     KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF _____   §

      THAT, _____ ("Grantor"), for and in consideration of the sum of Ten Dollars ($10.00) in hand paid to Grantor by SUSSER PETROLEUM PROPERTY COMPANY, a Delaware limited liability company (herein referred to as "Grantee") whose mailing address is P.O. Box 9036 Corpus Christi, Texas 78469, and other good and valuable consideration, the receipt and sufficiency of which consideration is hereby acknowledged, has GRANTED, SOLD and CONVEYED and by these presents does GRANT, SELL and CONVEY unto Grantee that certain tract of real property located in _____County, Texas as more particularly described on Exhibit A attached hereto, incorporated herein and made a part hereof for all purposes, together with all of Grantor's benefits, privileges, easements, tenements, hereditaments thereon or in anywise appertaining thereto rights, privileges, and appurtenances pertaining thereto, including without limitation all of Grantor's right, title, and interest in any adjacent streets, alleys strips, gores, rights-of-way, licenses, reversionary interests, all oil, gas, and other minerals, and permits related to real property (said real property together with any and all of the related rights and appurtenances being herein collectively referred to as the "Property").

      TO HAVE AND TO HOLD the Property together with all and singular the rights and appurtenances thereto in anywise belonging unto Grantee, its successors and assigns, forever, subject to the matters herein stated and assumption of ; and Grantor's does hereby bind itself and its successors and assigns to WARRANT AND FOREVER DEFEND all and singular the Property unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantors, but not otherwise; provided that this conveyance and the warranty of Grantors herein contained are subject to the matters described on Exhibit B attached hereto, to the full extent the same are valid and pertain to the Property (the "Permitted Encumbrances"), and any and all restrictions, reservations, covenants, conditions, easements, mineral leases, mineral and royalty interests, and all other matters, if any, affecting the Property and of record in the real property records of the County in which the Property is located, and to taxes and other assessments affecting the Property for the current year (subject to proration), and for all subsequent years, payment of which Grantee hereby assumes.

      **EXCEPT FOR THE SPECIAL WARRANTY OF TITLE STATED HEREIN, THE PROPERTY IS HEREBY CONVEYED AS IS, WHERE IS AND WITH ALL FAULTS, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF WHATSOEVER**

NATURE, EXPRESS OR IMPLIED, ORAL OR WRITTEN; IT BEING THE INTENTION OF GRANTOR AND GRANTEE TO EXPRESSLY REVOKE, RELEASE, NEGATE AND EXCLUDE ALL OTHER REPRESENTATIONS AND WARRANTIES BY GRANTOR, INCLUDING (BUT NOT LIMITED TO) ANY AND ALL EXPRESS OR IMPLIED REPRESENTATIONS AND WARRANTIES OF MERCHANTABILITY, ACCESSIBILITY, ECONOMIC VIABILITY, CONDITION, SUITABILITY, HABITABILITY, GOOD AND WORKMAN LIKE CONSTRUCTION, AND FITNESS FOR ANY PARTICULAR USE OR PURPOSE. GRANTEE FURTHER ACKNOWLEDGES AND UNDERSTANDS THAT THERE MAY BE HARMFUL, HAZARDOUS OR TOXIC SUBSTANCES OR SOLID WASTES ON, IN, ABOUT OR RELEASED FROM OR TO THE PROPERTY, AND GRANTOR MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING THE EXTENT, LOCATION OR NATURE OF THE SAME. GRANTEE ACKNOWLEDGES THAT GRANTEE HAS HAD THE OPPORTUNITY TO INSPECT THE PROPERTY TO GRANTEE'S FULL SATISFACTION. GRANTEE ACCEPTS THE PROPERTY IN ITS "AS IS, WHERE IS" CONDITION, WITH ALL FAULTS. GRANTEE, BY ITS ACCEPTANCE OF THIS DEED, EXPRESSLY WAIVES ANY RIGHT OR CLAIM AGAINST GRANTOR, GRANTOR'S BENEFICIARIES, TRUSTEES, PARTNERS, DIRECTORS, OFFICERS, AGENTS, ATTORNEYS, MEMBERS, AND RELATED PARTIES, FOR DAMAGES, RESCISSION OR OTHER REMEDY AT LAW OR EQUITY WITH RESPECT TO OR RESULTING FROM THE PROPERTY, INCLUDING WITHOUT LIMITATION, THE PHYSICAL OR ENVIRONMENTAL CONDITION OF THE PROPERTY, ANY LEASES ON THE PROPERTY, OR THE RIGHTS OF ANY PARTIES-IN-POSSESSION OF THE PROPERTY.

*[Signature Lines on Following Page]*

EXECUTED on the date of the acknowledgment hereinbelow, to be effective however as of the
___ day of _____, 2015.

GRANTOR:

_____

By: _____
Name: _____
Title: _____

STATE OF TEXAS

COUNTY OF _____

    Before me the undersigned authority on this day personally appeared
_____, known to me to be the person whose name is subscribed to the foregoing
instrument, and known to me to be the _____ _____ of
_____ _____, and acknowledged to me that he executed said instrument for the
purposes and consideration therein expressed, and as the act of said _____ ___. Given
under my hand and seal of office this ____ day of _____, 2015.

(NOTARY SEAL)

_____
Notary Public, State of _____

Printed Name: _____
Notary Commission No.: _____
My Commission Expires: _____

Exhibit A to Deed
<u>Property</u>

Exhibit B to Deed
Permitted Encumbrances

Exhibit C
Bill of Sale

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION dated effective as of
_____, 20__ (this "*Bill of Sale*") is executed and delivered by AZIZ CONVENIENCE
STORES, L.L.C., a _____ limited liability company ("*Seller*") and SUSSER
PETROLEUM PROPERTY COMPANY, a Delaware limited liability company ("*Buyer*").

### RECITALS

Reference is here made to that certain Purchase and Sale Agreement by and between the
Sellers and Buyer, dated as of _____ _____ ___, 2015 (the "*PSA*").

Seller desires to convey to Buyer all of the Assets (as defined in the PSA).

WHEREAS, any capitalized term used herein and not otherwise defined shall have the
meaning ascribed to it in the PSA.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of
which are hereby acknowledged, the Seller hereby sells, transfers, assigns, conveys and delivers
unto Buyer and its successors and assigns all of the Assets, including, without limitation, the
Merchandise Inventory, the Supplies Inventory, the Fuel Inventory, the Permits, the Personal
Property and Equipment, and the Assumed Contracts.

TO HAVE AND TO HOLD unto Buyer and its successors and assigns forever the
Assets, together with, all and singular, the rights and appurtenances thereto in any way belonging
to Seller.

Buyer accepts the foregoing assignment and assumes and agrees to be bound by and to
perform and observe all of the obligations, covenants, terms and conditions to be performed
observed under the Assumed Contracts arising on or after the date hereof.

Seller hereby agrees to perform, execute and/or deliver or cause to be performed,
executed and/or delivered, any and all such further acts, assurances and instruments as Buyer
may reasonably require to complete or perfect the conveyance and transfer to Buyer of all of
Seller's rights, title and interest in and to the Assets, and to do all such further acts and things as
may be reasonably necessary or useful to effect completely the intent of this Bill of Sale.

This Bill of Sale shall be governed by and construed in accordance with the internal laws
of the State of Texas, without regard to conflicts of law principles.

This Bill of Sale is executed and delivered in connection with the PSA; provided that this Bill of Sale is subject and subordinate to all of the terms and provisions of the PSA, and in the event of any conflict between any term or provision hereof and any term or provision of the PSA, the latter shall control.

**THE ASSETS ARE CONVEYED AND ASSIGNED TO BUYER "AS IS" AND "WHERE IS". SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, REGARDING THE ASSETS OR ANY OTHER MATTER, AND ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED BY SELLER INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

This Bill of Sale shall bind Seller and inure to the benefit of the Buyer and its respective successors and assigns.

*[Signature Lines on Following Page]*

IN WITNESS WHEREOF, this Bill of Sale has been duly executed and delivered by each Party as of the date first above written.

**SELLERS:**

**AZIZ CONVENIENCE STORES, L.L.C.,**
A Texas limited liability company

By:_____
Name:_____
Title:_____

**BUYER:**

**SUSSER PETROLEUM PROPERTY COMPANY**,
a Delaware limited liability company

By:_____
Name:_____
Title:_____